735 A.2d 39 (1999)
324 N.J. Super. 245
STATE of New Jersey, Plaintiff-Respondent,
v.
Alhamid BASKERVILLE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued August 10, 1999.
Decided August 31, 1999.
Thomas R. Ashley, Newark, for defendant-appellant (Ashley & Charles, attorneys; Mr. Ashley, on the brief).
Robert L. Cerefice, Assistant Prosecutor, for plaintiff-respondent (Donald Campolo, Acting Essex County Prosecutor, attorney; Mr. Cerefice, of counsel and on the brief).
Before Judges KESTIN and FALL.
The opinion of the court was delivered by KESTIN, J.A.D.
Defendant was charged with and convicted of two third degree crimes: distribution of a controlled dangerous substance, and distribution in a school zone. On the State's motion, and pursuant to N.J.S.A. 2C:43-6f, the trial court imposed an extended term sentence on the merged convictions, requiring defendant to serve a prison term of seven years with three years of parole ineligibility. Appropriate statutory penalties, assessments and fees were also ordered, along with a twelve-month driver's license suspension.
Among the issues defendant raises on appeal are that the State's expert improperly rendered an opinion in the matter, and that the verdict was against the weight of the admissible evidence. Applying prevailing principles governing the admissibility of expert testimony in drug prosecutions, most recently addressed in detail by the Supreme Court in State v. *40 Berry, 140 N.J. 280, 658 A.2d 702 (1995), we reverse.
In this prosecution on the two drug distribution charges, the State presented its case through three witnesses. Detective Hector Mejias of the Newark Police Department was on narcotics section duty in an undercover role on the day defendant was arrested. Detective Willie Stroud, also of the Newark police, was working with Mejias and a third officer. Detective Herman Rivera of the Essex County Sheriff's Department testified "as an expert in the field of narcotics." Defendant testified on his own behalf and offered two other witnesses in support.
Detective Mejias testified that, at about 7:15 p.m. on September 11, 1996, his team was near 762 South Seventeenth Street in an unmarked vehicle "on an investigation," observing activities at that address. The officers were at a location some 150 to 170 feet north of the property. Mejias, using binoculars, observed three black males on the sidewalk "in front of a vacant lot in the area * * * just hanging about, talking." A black female approached and[1]
walked up to the three individuals that were standing in front of the lot and they appeared to engage in some type of conversation. [Defendant (Baskerville) ] stepped away from the group. He walked several feet away from them in a northerly direction and went to a black vehicle which was parked ... inside the vacant lot. The rear of the vehicle was facing the street, so it had been driven straight into this lot.
When he approached the vehicle he bent down at the rear of the vehicle which ... was facing the street. He ... bent down [and] reached up under what I described as the undercarriage, somewhere up under the body of the vehicle, up around the chassis area and he pulled out something from there that I believed was a brown paper bag.
He reached inside the bag, he removed something from within the bag and replaced the bag back underneath the car.
He then got up, walked back to the female and an exchange was made where the female handed him what I believe was paper money in exchange for whatever it was that he took from under the car.
Q And you say what you believe was paper money or currency. Why do you say that?
A ... [F]rom where I was at I really can't say that it was in fact money. It appeared to me that it was money.
Q And after he made this exchange with the female what happened?
A ... [T]he female turned and walked in a southerly direction, basically, the way she had come and [defendant] then placed the money into his pants pocket. [After the female left the area,] the three [males] remained there for maybe two minutes, three minutes and at one point one of them turned and walked away, he just walked out of the area.
Shortly after that a vehicle, a four-door blue vehicle * * * pulled north on South 17th Street and came to a stop in this area here, just past where the males were standing. The passenger of that vehicle exited and the vehicle then continued on and made a right turn to travel east on Springfield Avenue.
The individual that got out of the car [Culver] walked up to the two remaining males[.]
Once again, I observed some type of conversation and, again, Baskerville walked to the vehicle, he then reached up under the car, removed what I believed again was the bag, he removed whatever it was that was in the bag and he held it in his hand and it appeared to me that he was counting it. He then crumpled up the bag and tossed it in the *41 lot, got up and walked back to where [Culver] was.
Again, a similar exchange took place where Baskerville received what I believed was money from Culver, paper money in exchange for the item or items that he had taken from within the bag.
Q And where did ... Baskerville place the money?
A He placed it again in his pocket.
Q And when he received the money from the female where did he place that money?
A He placed it in his pants pocket.
Q Do you recall which pocket it was?
A I believe it was his right front pants pocket.
Q Now, after you made this observation what did you guys do?
A Well, at the completion of that exchange Culver began to walk north on South 17th Street towards Springfield Avenue. He then turned
Q So, he was walking towards you?
A He was walking towards us. When he got to the corner of Springfield Avenue he turned right and he began to walk east on Springfield Avenue[,] * * * * towards South 16th Street. [A]t that point I believed that I had observed two separate drug transactions and I naturally conferenced the matter with my partners and we decided that it was an opportunity for us to apprehend the individual who we suspected to be the buyer as well as apprehend the individual who we suspected to be the seller.
Q And why did you feel that would be an opportunity?
A Because of where the other individual was situate when we determined that. He was already on Springfield Avenue out of the view of the individual who we suspected to be the seller which would have been Baskerville and we felt that we could apprehend him and then return and apprehend Baskerville. [W]e believed that we could work our way over there without anybody detecting us and knowing that we were there.
We immediately picked up from where we were at, we made the left turn onto Springfield Avenue and we pulled right alongside the curb near South 16th Street and Springfield Avenue where we could now see Culver walking.
As soon as he saw us coming to a stop he immediately dropped something from his hand. We detained him, myself and Detective Rosania detained him. Detective Stroud recovered the item he dropped and it turned out to be nine vials of suspected cocaine each with a black cap and they were bound with an elastic band.
He was immediately placed under arrest after Detective Stroud made his recovery.
Q And what did Detective ... Stroud do with the vials of cocaine?
A He held them in his possession, he held onto them.
Q After you made the arrest then where did you go?
A We immediately made a U-turn and came down this way and went right to 762 South 17th Street.
Mr. Baskerville was still there with a second individual, they were still standing there. [W]e exited our vehicle, we identified ourselves once again and based on the findings on Springfield and South 16th we placed Mr. Baskerville under arrest.
Q After the two individuals were detained where did you go?
A Well, I eventually walked over to the... black vehicle where I had seen Mr. Baskerville reach up under. Q And what were you doing over there?
A I went to see if there was anything under the vehicle in the same area where he had been reaching, I saw him reach on two occasions.
Q And did you find anything?
A No, ma'am, I did not.
*42 Q And did you notice anything else in the area there?
A There were numerous paper bags crumpled up and strewn about the area, but up under the undercarriage I gave it a very thorough look and there was nothing under there.
Mejias went on to testify that $897 in cash was discovered by Officer Stroud on defendant's person. It was later established that the money consisted of bills of various denominations including singles, fives, tens, twenties and fifties. Mejias also identified the nine vials of cocaine that had been retrieved when Culver dropped them, and he testified that the location was in a school zone.
On cross-examination, it was established that the police had been located about 150 to 170 feet from the objects of their surveillance. After some additional questioning, the following colloquy occurred:
Q Now, is it also your testimony that when Mr. Baskerville went over to the car [following his conversation with the female] he removed what appeared to be a brown paper bag?
A The item was brown, I believed it to be a brown paper bag, yes.
Q But you don't know what it was?
A I don't know that it was in fact a brown paper bag. It did appear to be one.
Q Now, is that because you were far away that you couldn't determine exactly what the item was?
A I couldn't see that it was in fact even paper. The item was brown and the way it was handled it appeared to be a bag, but I can't say for sure because of where I was situated, yes.
Q Is that because of the distance?
A Well, the distance, I couldn't say for sure that it was.
Q Now, isn't it correct that because you were that far away you couldn't determine whether Mr. Baskerville stuck his hands into that object?
A No. He reached into the object, whatever it was he appeared to reach into it. That's what it looked like he was doing, reaching into it. That's what led me to believe that it was a bag of some type because of the way he handled it.
Q How big did this object appear?
A It wasn't very big. Six, maybe eight inches. I don't know. It wasn't a real big bag, it was a small one. ...[F]rom 150 feet, 160 feet away I could see something brown and believe that it's paper. It might be cloth. I wouldn't say that it was a paper bag because I really couldn't see that it was a paper bag.
Q Now, did you see Mr. Baskerville remove anything from that object?
A Did I see what he removed? I didn't see exactly what came out of the bag ... or the object.
Q Did you see something come out of the bag?
A I saw the hand come back out.
Q But you didn't see anything taken out of the bag?
A Whatever it was was in the hand, if something was taken out.
Q If something was taken out. So you're not saying something was taken out?
A I believed something was, that was the opinion that I
Q Sir, I'm not asking whether you believed. I'm asking did you see Mr. Baskerville remove something from the bag?
A I said I did not see exactly what was removed from the bag.
Q * * * Now, after you observed what you believed to be Mr. Baskerville reaching into an object, it is your testimony that Mr. Baskerville then returned to the area where these three people were?
A He returned back to the group, that's correct. That was after he replaced the brown, what I believed was a brown bag up under the car somewhere.

*43 Q And is it your testimony that Mr. Baskerville obtained something from this lady?
A He obtained what I believed was paper money, based on what I could see.
Q Did you see Mr. Baskerville obtain something from this woman?
A Yes, I did.
Q Did you see what this item was?
A What it was exactly?
Q Yes.
A No. I only believed what it was, I didn't see exactly what it was. I can't say that it was money.
Q * * * Now, you also testified that you saw Mr. Baskerville put something into his pocket?
A Yes, ma'am.
Q What did he put into his pocket?
A Whatever it was that he received. What I said I believed to be paper money from the female he placed into his pocket.
Q But you didn't see what the object was that he received, correct?
A No. That's why I said it could have been counterfeit, but it appeared to be money. That's why I only said it appeared to be money. I can't be specific about color. It only appeared to be money. The way it was handled and what it appeared to be when I saw the exchange, it appeared to be money.
Q What do you mean the way it was handled? ... [W]hen he obtained this object or what you believed to be money from this person, how did the transfer take place?
A Well, when someone counts money out there's a certain way that the money is counted out and it appeared to be money from where I could see money being counted out and handed to him.
Mejias acknowledged that his incident report did not mention "anything about somebody counting money." Regarding the $897 in cash found on defendant's person:
Q It wasn't a bundle, ... crumpled?
A No, it was folded.
Q Were they folded bills folded over each other?
A Looked like one wad of money. The bills were placed and folded on top of one another.
Q Now, when you saw Mr. Baskerville take this item from his person did he pull out the money and then fold that bill over?
A No. I did not see him do that, no.
Cross-examination continued on another aspect of defendant's conduct in dealing with Culver, as observed by Mejias:
Q Now, ... it's your testimony that this time things were done differently in that Mr. Baskerville crumpled up this brown object and tossed it to the ground, correct?
A After reaching up under the car, removing the object, again, placing his hands inside the object which I believed was a bag he crumpled it up and tossed it into the lot.
Q You keep saying he removed an object, but you just testified earlier that you couldn't see that he removed an object.
A I believed he removed an object from the bag. I couldn't see what was taken from the bag. I believed that he removed an object from the bag.
Q But you couldn't see whether it was money that was handed to Mr. Baskerville, correct?
A It could have been counterfeit money for all I know. It could have been play money. I don't know. I can't say that it was in fact money because I don't know.
Q Now, when you say Mr. Baskerville appeared to be counting something, could you show this jury how he ... appear[ed] to be counting.
A He held the object in his hand and it appeared that he was rif[f]ling through it with his hand. As I said, I don't know *44 if in fact he was counting, but it appeared that he was the way he was handling it.
Q So, you're saying now that he appeared to be rif[f]ling through something in his hand?
A With his hand. He appeared to be going like with one hand pointed into the other as if he was counting. That was my belief. That's what I believe he was doing.
Q So, you're characterizing what you saw?
A Based on what I saw I believe he was counting, that's correct.
Q Did you see what was in his hands?
A No. I could not see what was in his hand, not from there, no.
Q Now, when [Culver] left the area you went around him and arrested him, correct?
A When he was on Springfield Avenue near South 16th Street we moved in on him and we arrested him, that's correct.
Q Now, when you were attempting to arrest Culver he dropped something to the ground, correct?
A That's correct. It was nine objects wrapped around or wrapped by an elastic band.
Q * * * [Y]ou don't know whether the object dropped by Mr. Culver is what Mr. Baskerville had in his hand, correct?
A Well, the way Mr. Culver took possession of the item, and we never lost sight of him at all from the minute he left till the minute we placed him under arrest, we never lost sight of him. The item he had received he maintained, he kept it in his hand the entire time.
Q My question is, sir, can you say, do you know whether the object that was in Mr. Baskerville's hand is the object that Mr. Culver dropped to the ground when you attempted to arrest him?
A I believe it was.
Q You believe it was. Do you know whether it was?
A I can't say that it was in fact. I believe it was. That's all I can say.
Q Now, when you went to the black car and you searched up under the car, like you said you did, did you find any drugs?
A I found nothing under the car.
Q ... [S]o you didn't find any vials with black tops?
A I found absolutely nothing under the car.
Ultimately, under re-cross examination, Mejias testified further:
Q But you can't say whether what Mr. Baskerville received from that lady and Mr. Culver was indeed money, correct?
A That was the only thing that was recovered from his person, the money. There was nothing else recovered.
Officer Stroud's testimony corroborated that of Officer Mejias. Stroud was not using the binoculars and was no more definite than Mejias had been on the details of defendant's conduct. During his cross-examination, some questioning focused on the connection between defendant and the cocaine retrieved after Culver dropped it:
Q When Mr. Culver was in the area of 762, in that lot, you didn't see anybody give him anything, correct?
A No, I didn't see anybody give him anything.
Q * * * And then at some point when he went down onto Springfield, it's your testimony that you saw him drop something, correct?
A That's correct.
Q * * * You don't know where that came from, do you?
A I wouldn't say I don't know where it came from.
Q You didn't see Mr. Baskerville give him that object, did you?
A No. I didn't see him give it to him.

*45 Q So, you don't know that that object came from Mr. Baskerville, do you? Just answer yes or no. Do you know that the object that was dropped by Mr. Culver came from Mr. Baskerville?
A I would have to say yes.
Q But you didn't see Mr. Baskerville give him the object, did you?
A I didn't see him give it to him, that's correct.
Q So, are you guessing that Mr. Baskerville had given him the object?
A No, I'm not guessing.
Q * * * So, the drugs that were recovered in this case, those nine vials that the State showed to you, you actually picked them up after Mr. Culver dropped them, correct?
A That's correct.
Q Not after Mr. Baskerville dropped them, right?
A That's correct.
Q Now, at some point Mr. Baskerville was arrested, correct?
A That's correct.
Q Did you conduct a search on Mr. Baskerville?
A I conducted a pat down frisk of him at the scene.
Q * * * At some point ... a more thorough search was conducted, correct?
A That's correct.
Q Did you recover drugs from Mr. Baskerville?
A No, ma'am.
After a recitation of his credentials, Detective Rivera was qualified "as an expert in the field of narcotics." The assistant prosecutor immediately posed a hypothetical question:
[A]ssume that it is around 7:15 in the evening and three individuals are in front of a vacant lot on South 17th Street and as these three individuals are out there a female approaches them. ... [A] brief conversation takes place[.]

* * * *
[O]ne of these individuals leaves the group and walks over to ... the back of a black vehicle and it appears that he takes an object which looks like a brown paper bag from underneath it. He reaches into that item ... and he pulls something out, clutches it in his hand[. H]e walks back to the female, there's an exchange that takes place and it appears to be that she gives him currency for what is in his hand. The female walks off. * * * [O]ne of the individuals leaves the group. At this point a vehicle approaches and the passenger gets out of the vehicle and approaches again that same individual ... that went to the black vehicle. ... [I]t appears ... a brief conversation takes place and that individual, again, goes back to the black vehicle and this time he takes out, again, from underneath the vehicle what appears to be a brown paper bag. He reaches into that item, takes what's in there out, crum[p]les it and discards it. At this point he goes back to that individual, the passenger[,] and it appears to be an exchange of currency for what is in his hand. At that point the passenger walks off down the street[.] ... [D]o you have an opinion as to what occurred there?
Rivera responded affirmatively and offered an opinion:
Based on my training and experience, in most of your major cities where there's a lot of people coming through and vehicles stopping, you have a street dealer that is usually standing on a corner or nearby that would utilize a stash location, a place where he or she will stash narcotics while controlling it and he or she will go back and forth to it. If there are detectives making certain observations they will just make that observation that they will see the individual going back and forth to a particular area. While they're probably not close enough to see what actually is being dealt or taken out of the bag, if you see *46 this action more than once or twice one can naturally assume that there are narcotics being stashed in that particular area. In my opinion the individual was, the individual was selling narcotics. There was an exchange of currency for something and those individuals are walking away rather quickly from the area, not staying very long. (emphasis supplied)
The assistant prosecutor continued:
Now, detective, I want you to further assume that the individual, the passenger who walked away down the street, surveillance unit came into the area and went to arrest that individual and at that point in time he dropped what appeared to be nine vials of cocaine. They arrested that individual and then they went back to the location and went to apprehend the individual who ... went to the black vehicle. They did so and they did a search and they found no more drugs on him or at that vehicle. Would that change your opinion?
A No, not at all.
Q ... [W]hat's the basis of that opinion?
A It is evident ... that the detectives made certain observations, that the individual who they grabbed, being the buyer, is now in possession of a certain amount of vials and just based on the totality of the circumstances this individual sold that second individual those narcotics. (emphasis supplied)
Q And I want you to further assume that the individual that went to the black vehicle had on his person $897 and the denominations of that was two $50 bills, twenty four $20 bills, nineteen $10 bills, seventeen $5 bills and forty two $1 bills totaling the amount of $897. Do you have an opinion as to the significance of the denominations?
A Yes, I do.
Q And what is that?
A In my opinion this is what we term as small currency where an individual that's working a particular corner, if they're selling five dollar vials or ten dollar vials usually most people come with exact change. They're going to buy one or two vials and that's what they're going to purchase it for, they have the exact change. Once again, given the totality of the circumstances, the fact that this individual did away with, I believe nine vials, I'm of the opinion that this individual worked that corner for a certain amount of hours, what have you, and sold out. These are probably those proceeds of that given timeframe. (emphasis supplied)
Q Detective, I want you to look at S-9 which are the nine vials of cocaine and I want you to assume those nine vials do have .1 gram of cocaine. Would that change your opinion as to the testimony or I want you to incorporate that into the hypothetical and would that change your testimony?
A Wouldn't change it, except that it would strengthen it.
Q And why would it strengthen it?
A These particular vials here would go for approximately $10 and as little as $5.
Q What is the basis of your opinion?

* * * *
A Well, in the first place most individuals do not purchase nine vials for their own personal consumption. If they do so they will purchase one or two vials at any given time. That's basically it.
This concluded Rivera's direct examination. Nothing remarkable occurred during cross-examination. Defense counsel, inter alia, attempted to focus the inquiry on the fact that the drugs had been found on Culver, not on defendant. On re-cross-examination, over objection, defense counsel was permitted to extend the inquiry to cover the "way in which drug dealers arrange their money."
Defendant, in his testimony, alleged that he had been in the area under surveillance to inspect a used automobile for possible *47 purchase. Two other witnesses corroborated defendant's version.
Focusing on the facts at issue, it is clear that critical portions of Rivera's testimony had nothing to do with "a subject matter that is beyond the ken of the average juror." State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984). Expert testimony is limited to that which "will assist the trier of fact to understand the evidence or determine a fact in issue." Berry, supra, 140 N.J. at 291, 658 A.2d 702 (quoting Fed.R.Evid. 702 and N.J. Evidence Rule 56(2) (now N.J.R.E. 702)). If the ultimate question to be determined had been whether the surveillance officers had a valid articulable suspicion, based on what they had observed, to make a Terry[2] stop and inquiry, or even a full search, the expert's opinion would have been appropriately received to establish the indicia of drug trafficking and the reasonableness of the officers' impressions. But where the question was whether this defendant had, in fact, distributed the drugs as charged, Rivera's opinion, beyond describing methods used by those involved in drug distribution, added nothing that could validly be considered. Portions of his testimony describing, generally, typical methods used may well have been admissible to assist the jury in understanding the evidence, but his opinions that drug transactions had, in fact, occurred (which we have highlighted for the sake of clarity), were fatally beyond the pale of the permissible. They added elements to the State's proofs which rendered the trial unfair.
The issue before this jury was whether the State had proved beyond a reasonable doubt that defendant had distributed drugs. This was, purely and simply, a question of fact which the jurors were capable of deciding from the testimony of the fact witnesses alonethe officers on the sceneaided, perhaps, by an expert's description of methods typically used in drug transactions. See Berry, supra, 140 N.J. at 292-93, 658 A.2d 702 ("[E]xpert opinion is admissible if the general subject matter at issue, or its specific application, is one with which an average juror might not be sufficiently familiar, or if ... the expert testimony would `assist the jury in comprehending the evidence and determining issues of fact.'" (quoting State v. Odom, 116 N.J. 65, 70, 560 A.2d 1198 (1989))).
Expert opinion particularly characterizing the interaction between defendant and others could not aid the jury in resolving that simple fact without the risk of usurping the jury's function. The testimony, as an opinion on the ultimate question, was unduly prejudicial in the circumstances. An expert's opinion concerning the particular transaction might well impel the jury to an affirmative conclusion on the focal issue whether the State's fact witnesses had established the distribution element of the crime beyond a reasonable doubt; and that could only be accomplished
for the "impermissible and prejudicial" purpose of enhancing the credibility of [a fact witness's] version of the facts:
We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct.
[United States v. Cruz, 981 F.2d 659, 663 (2d Cir.1992).]
N.J.R.E. 704, like its counterpart Fed. R.Evid. 704(a), also authorizes the admission of expert testimony that encompasses ultimate issues to be decided by the trier of fact, Odom, supra, 116 N.J. at 77-81, 560 A.2d 1198, (interpreting predecessor to N.J.R.E. 704). Concerning the admissibility of expert testimony addressing an ultimate issue, we noted *48 in Odom that "the dominant authority throughout the country has ruled that an expert witness may testify that a defendant possessed a controlled dangerous substance with the intent to distribute it, even if the opinion is expressed in the language of the statutory offense." Id. at 79, 560 A.2d 1198. However, a number of federal and state courts have expressed concern that under certain circumstances expert testimony in drug cases embracing ultimate issues might be so prejudicial as to require exclusion. The evidentiary rules allowing admission of expert testimony on ultimate issues repudiate the common-law rule precluding such testimony because it invaded the jury's province. See [Deon J.] Nossel, [The Admissibility of Ultimate Issue Testimony By Law Enforcement Officers in Criminal Trials], 93 Colum. L.Rev. [231,] 235 [(1993) ]. Although admissible, such testimony may be excluded if its probative value is substantially outweighed by the risk of undue prejudice. N.J.R.E. 403(a); see Fed.R.Evid. 403. In drug prosecutions, that risk of prejudice has prompted courts to exercise caution in determining whether expert testimony touching on ultimate issues properly was admitted at trial.
[Berry, supra, 140 N.J. at 297-98, 658 A.2d 702.]
Cruz was an appeal from a conviction "for various drug-distribution offenses." Id. at 297, 658 A.2d 702. In Berry, the Supreme Court went on to quote another United States Court of Appeals opinion articulating a definitive position in distinguishing pertinent considerations as between drug distribution cases and others, such as those involving the intent to distribute, holding, even as to the latter, that there are limits to the scope of what is permitted from expert witnesses:

[T]here is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted that pattern, at least when other inferences could have been drawn not unreasonably although perhaps not as reasonably as that to which the expert testified. * * * * Even though the testimony is not barred by F.R.E. 704(b), district judges should heed the Advisory Committee's Note to Rule 704:
The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.
We would thus agree with Judge Newman's precautionary observations about the admission of such testimony in United States v. Young, 745 F.2d 733, 765-66 (2 Cir.1984) (Newman, J., concurring), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985), which we quote in the margin, and commend this for consideration by district judges.
[United States v. Brown, 776 F.2d 397, 401 (2d Cir.1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (quoted in Berry, supra, 140 N.J. at 299, 658 A.2d 702) (emphasis supplied).]
Judge Newman's separate opinion in Young, cited with such approval by Judge Friendly in Brown, warrants at-length exposition and emphasis here, for it dealt with a situation of similar content and value to the one before us:
I ... write separately to express a caution concerning expert opinion offered to establish that ambiguous conduct constitutes criminal activity. My concern is prompted by the "Flash Inn Incident," which comprises three of the *49 predicate acts the jury was permitted to rely upon in finding Myers guilty of a "continuing criminal enterprise" offense, 21 U.S.C. § 848 (1982). A telephone call was made from Myers's home at 9:34 p.m. on January 14, 1983, to arrange a meeting with a man at the Flash Inn. Shortly thereafter Myers and another man drove to the inn and waited. Within a half hour, another car arrived with two men; the driver of the second car spoke with the occupants of Myers's car. All four then entered the inn. Myers's companion entered with a light-colored handbag and exited two minutes later with a dark-colored handbag, which he placed in the trunk of the second car. Myers left two minutes later in his car. Detective Magaletti was permitted to testify that in his opinion a sale of drugs had occurred. The episode raises two distinct issues: (1) whether the expert testimony was admissible and (2) whether the evidence was sufficient to show the commission of predicate offenses.
1. Until this Court's decision last year in United States v. Carson, 702 F.2d 351 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), I would have had serious doubts whether an expert could give an opinion that an observed set of circumstances constituted commission of a crime. The test for admissibility is whether the witness's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. I do not doubt that an experienced narcotics agent has the requisite knowledge to assist a jury by explaining "the clandestine manner in which drugs are bought and sold." United States v. Carson, supra, 702 F.2d at 369. But I question whether an expert's opinion that the events he observes constitute a drug transaction provides very much, if any, assistance to a jury, beyond whatever inference is available to be drawn by the jury from all the evidence. Not too long ago we characterized as "highly unusual" an expert's opinion that observed events showed a defendant to be a "controller" of a gambling operation. United States v. Sette, 334 F.2d 267, 269 (2d Cir.1964).
Even if admissible under Rule 702, opinion testimony is still subject to exclusion under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Whatever slight probative value arises from a narcotics expert's personal opinion that an observed transaction involved a sale of drugs must be carefully weighed against the distinct risk of prejudice. The "aura of special reliability and trustworthiness" surrounding expert testimony, which ought to caution its use, United States v. Fosher, 590 F.2d 381, 383 (1st Cir.1979); United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir. 1973), especially when offered by the prosecution in criminal cases, United States v. Green, 548 F.2d 1261, 1268 (6th Cir.1977), poses a special risk in a case of this sort. That risk arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. The risk is increased when the opinion is given by "the very officers who were in charge of the investigation," United States v. Sette, supra, 334 F.2d at 269.
I recognize, however, that in United States v. Carson, supra, we upheld the admission of expert opinion under circumstances very similar to those in this case. Other circuits have also permitted an expert to give his opinion that a defendant's ambiguous conduct is criminal. United States v. Fleishman, 684 F.2d 1329, 1335-36 (9th Cir.) (defendant's role as "lookout" in drug transaction), cert. denied, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); United States v. Scavo, 593 F.2d 837, 840, 843-44 (8th Cir.1979) (defendant's role in gambling operation); United States v. Masson, 582 F.2d 961, 963-64 (5th Cir. *50 1978) (same). In light of Carson and these other rulings, I cannot say it was error to admit the testimony of Detective Magaletti that Myers was selling narcotics at the Flash Inn on January 14. But the very breadth of the discretion accorded trial judges in admitting such an opinion under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should not routinely admit opinions of the sort at issue here and should weigh carefully the risk of prejudice.
2. Even though it was not error to admit Magaletti's opinion that Myers was selling drugs at the Flash Inn on January 14, the question remains whether the evidence concerning that episode sufficed to permit the jury to find beyond a reasonable doubt that a narcotics violation had occurred on that occasion. The hazard of permitting the opinion in evidence ought to make courts cautious in assessing the sufficiency of a case based heavily on such an opinion. If the observed actions of a defendant do not establish a prima facie case, I do not believe that an expert's opinion that his actions are criminal may carry the prosecution's proof above the requisite line. It is one thing to permit a jury to weigh that opinion in considering an otherwise adequate case; it is quite another matter to let that opinion salvage an insufficient case. In United States v. Sette, supra, we rejected the sufficiency of the prosecution's case that rested primarily on an expert's opinion that observed conduct was criminal. "We are cited to no case, and have found none, that remotely justifies this highly unusual method of establishing a prima facie case in a criminal prosecution of this type." Id. at 269. In United States v. Carson, supra, and the other cases allowing an expert to give an opinion concerning criminal conduct, the evidence, apart from the expert opinion, provided the jury with a substantial basis for finding guilt beyond a reasonable doubt.

If Freddie Myers had been on trial charged with the substantive offenses of possessing and distributing narcotics at the Flash Inn on January 14 and the evidence against him had consisted solely of the observable events of that evening, I would not consider the evidence sufficient to support a conviction on such charges. See United States v. Suarez, 487 F.2d 236, 238-40 (5th Cir. 1973) (suspicious contact with known narcotics dealer insufficient to support narcotics conviction), cert. denied, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974); cf. United States v. Ceballos, 654 F.2d 177, 184-86 (2d Cir.1981) (suspicious contact with known narcotics dealer insufficient even to establish probable cause to arrest). However, in determining whether Myers was dealing in drugs that evening, the jury was not limited to the evidence of the wiretapped phone call from his home and the ambiguous events observed at the scene. Strongly reinforcing the inference of a drug transaction was all of the evidence in the case, including the evidence tying Myers to a heroin cutting mill and his vast amounts of cash. When a person already implicated by such evidence participates in a clandestine exchange of handbags, a jury may infer that he was exchanging drugs for money.
[United States v. Young, 745 F.2d 733, 765-67 (2d Cir.1984) (Newman, J., concurring) (emphasis supplied).]
We need say little further. The testimony of Detectives Mejias and Stroud was entirely ambiguous, with none of the redeeming background qualities of the evidence offered against Freddie Myers in Young. The fact testimony of Mejias and Stroud left entirely open, without direct evidence of any kind, the question whether an incident or two of drug distribution had occurred. There can be no doubt that the opinion of Detective Rivera, directly elicited by the assistant prosecutor, was used to "carry the prosecution's proof above the requisite line[,] ... salvag[ing a potentially] *51 insufficient case." Id. at 766. And, the only instruction the trial court gave the jury regarding evaluation of the expert testimony was the standard charge bereft, in any particular, of special guidance. It failed to meet the Supreme Court's requirement:
In such cases, especially where the record includes both an innocent explanation for defendant's conduct as well as an expert witness's incriminating opinion about the same conduct, the trial court should carefully instruct the jury in the context of the evidence about its duty to decide whether to accept or reject the opinion of the expert witness.
[Berry, supra, 140 N.J. at 301, 658 A.2d 702.]
There were, in the interstices of Detective Mejias's and Stroud's testimony, factual details and perceptions from which the jury could validly have inferred that one or two incidents of drug distribution had occurred. For example, the record reflects Mejias's determination that the object defendant gave Culver was the same one that Culver, moments later, discarded, bolstered by the statement that the police officers never lost sight of Culver from the time he was first seen to the moment of his arrest. As a further example, there are also Mejias's statements regarding the presumed money that had passed from the female and Culver to defendant, reinforced by the testimony that what defendant received on each occasion he placed in his pocket and that the only thing recovered from defendant's person was the wad of money.
On the other hand, by way of contrast, the jury had Mejias's laudably candid concessions that, from a distance of 150 feet or more, he could not clearly discern the physical details of any of the objects involved. Unquestionably, if what passed from defendant to the putative purchasers, what passed from them to defendant, and the brown container that looked like a paper bag had been more positively identified, the testimony would have tended to establish more well-foundedly that a drug sale had occurred.
From the totality of the fact-witness testimony alone, the jury had sufficient bases from which to draw inferences in finding whether the State had proved its case for drug distribution. What the State, manifestly, was not entitled to was an enhanced proof opportunity, through expert opinion on the ultimate question, to salvage a potentially insufficient case. The circumstances at this trial were different from the more typical situation in a possession-with-intent-to-distribute case, where a police expert gives the jury a basis for determining more recondite questions, such as whether the quantity of drugs, the manner in which they were packaged, and other factors suggest an intent to distribute. There was nothing arcane about the question before this jury: Did defendant distribute drugs or not? Apart from furnishing expert assistance in understanding the incidents of drug trafficking, the State was not entitled to give the jury a non-factual basis for reaching a verdict on this entirely factual question. The fact-witness testimony should have spoken for itself. In the State's attempt to fill the unmistakable gaps in that testimony, and to strengthen the obvious weaknesses of its case, the prosecution could not validly suggest, through its expert witness, stronger inferences regarding the ultimate question than the fact testimony itself would support. In doing so, the State added an irredeemable element of undue prejudice to the trial.
In sum, on the simpleup or down factual issue in this case, the jury needed no assistance from an expert witness. The testimony of the State's fact witnesses, Mejias and Stroud, was either adequate to lead to a guilty verdict or it was not. The jury was free to base its determination on the facts developed and the fairand ordinaryinferences which could be drawn from those facts that tended to establish defendant's guilt on the distribution charges. Or, the jury could focus on the facts that the drugs in evidence came from *52 Culver and that there was no direct evidence connecting those drugs to defendant. The jury, by a process of fair inference based on common knowledge and good sense, enhanced by general background information which the expert witness could properly provide, was well equipped, without further assistance, as it found the evidence persuasive, to fill in the gaps which the direct evidence presented. Given the existence of those gaps, however, Detective Rivera's opinions on the ultimate question could not fairly and reasonably supply the missing, and necessary, connection. Accordingly, we conclude that the convictions cannot stand because, with the introduction of those opinions, an essential aspect of the proofs became irredeemably tainted by a risk of prejudice far outweighing its probative value. See N.J.R.E. 403.
The convictions are vacated and the matter is remanded for a new trial.
NOTES
[1] To conserve space and promote clarity, we recount testimony as given without indicating all elisions of extraneous or redundant matter.
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).