882 A.2d 987 (2005)
380 N.J. Super. 487
STATE of New Jersey, Plaintiff-Respondent,
v.
Ja-Quanda BOSTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 20, 2005.
Decided October 6, 2005.
Yvonne Smith Segars, Public Defender, attorney for appellant (Alison Perrone, Designated Counsel, on the brief).
Paula T. Dow, Essex County Prosecutor, attorney for respondent (Debra G. Simms, Special Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, LEFELT and R.B. COLEMAN.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
After a trial, defendant and a co-defendant were convicted by a jury of second-degree conspiracy, contrary to N.J.S.A. 2C:5-2, to violate laws respecting possession of heroin and cocaine and possession of those drugs with intent to distribute; two counts of third-degree possession of controlled dangerous substances, cocaine and heroin, in violation of N.J.S.A. 2C:35-10a(1); two counts of third-degree possession of those drugs with intent to distribute, in violation of N.J.S.A. 2C:35-5a(1) and b(3); and two counts of possessing those drugs in a school zone, contrary to N.J.S.A. 2C:35-7, also third-degree crimes. After appropriate mergers were effected, the court sentenced defendant to two concurrent three-year terms of imprisonment with three years of parole ineligibility. Appropriate, statutorily mandated assessments, penalties and fees were ordered along with a two-year suspension of defendant's driving privileges.
*988 In challenging the convictions on appeal, defendant raises the following issues:

POINT I THE ADMISSION OF EXPERT TESTIMONY ON DRUG TRAFFICKING THAT INCLUDED NOT ONLY GENERAL METHODS OF DRUG DISTRIBUTION BUT ALSO THE OPINION THAT DEFENDANT HAD DISTRIBUTED DRUGS IMPERMISSIBLY INVADED THE PROVINCE OF THE JURY. (Not Raised Below)

POINT II THE TRIAL COURT SHOULD HAVE GRANTED A JUDGMENT OF ACQUITTAL BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT HAD POSSESSED CDS.
Given the circumstances developed, our review of the record in the light of the arguments advanced by the parties and prevailing standards of law discloses substantial merit in defendant's argument that the testimony of the State's expert on drug trafficking impermissibly invaded the province of the jury. The factual scenario upon which the proffered "opinion" of the expert was premised was well-framed for our purposes in the opening statements of the prosecutor and counsel for this defendant. The prosecutor stated:
[O]n Thursday, May 1st, 2003 at about 12:45 in the afternoon a group of plain-clothed detectives from the Essex County Sheriff's Bureau of Narcotics arrived in the area of Magnolia Street and 18th Avenue to conduct an investigation. * * * And as part of that investigation Detective Stanley Garnes was set up to do an undercover surveillance near 26 Magnolia Street. This was done by his sitting in a car parked a little ways down the block and he made certain observations of the comings and goings and activities of people on that block. One very significant observation that he made was that he saw a woman come down the block and approach this defendant, Ja-Quanda Boston, who was out in the street and there was a brief conversation. After that conversation Miss Boston then went over to Mr. Jaleel Frazier, the co-defendant, and spoke with him. Mr. Frazier then proceeded inside the house, came out with something which he gave to Miss Boston. Miss Boston, in turn, gave the article to the person that approached her and took money in exchange for it. At that point, Detective Garnes radioed the back-up unit which was stationed a couple of blocks away to move in. When they came in they arrested Miss Boston. They approached Mr. Frazier, he ran into the house, up from the first floor to the second floor and then the third floor pursued by the detectives, and he was discovered ... on the third floor hiding under a table that was covered with plastic bags.
Now, before he ran he threw down four envelopes of heroin rubber banded together. They were marked with a green stamp that same Monster. [sic] Upstairs on the third floor Detective James Bradley picked up a bag, a plastic bag near where the defendant was found containing  it was open, by the way  containing 40 more decks of  envelopes of heroin  decks is a street term for envelopes  which were also stamped in green and said Monster on them. He also found in that bag 33 vials of cocaine.
Defense counsel, in her opening statement, countered that defendant had insisted from the outset that she
never conspired with Jaleel Frazier to possess and distribute cocaine and heroin, never was involved with Mr. Frazier on May 1st, 2003 as charged in the indictment with any constructive possession *989 . . . of heroin and cocaine, never engaged in any distribution or sale to anyone on May 1st, 2003 as alleged by the State.
... [W]hat the Bureau of Narcotics' officer or officers who we expect will testify saw and did is, in fact, just their version of what occurred. They may be mistaken. They may be fabricating.... What in fact ... Miss Ja-Quanda Boston did that afternoon certainly was nothing to do with illegal narcotic activity, nothing in furtherance of a conspiracy with Mr. Jaleel Frazier.
What was she doing on Magnolia Street on May 1st ... in the afternoon around 12:45? She was picking up her boyfriend, Mr. Donald Robinson, who lives at 26 Magnolia Street. And whatever observations the officer Garnes, the surveillance officer saw, was simply a girl friend getting out of a vehicle and going across the street into a house to pick up her boyfriend, was simply a girl friend leaving the house and going back to her car.... [I]ndeed Miss Boston was pulled from a vehicle by this officers, the back-up officers [sic] and subsequently charged in the conspiracy with Mr. Frazier and with the charges involving the possession and possession with intent to distribute the cocaine and heroin. She had absolutely nothing to do ... with the narcotic activities. She was simply picking up her boyfriend, Donald Robinson.
... [I]n fact my client's association with 26 Magnolia Street that afternoon was very brief and very cursory and had absolutely nothing to do with illegal narcotic activity; ... whatever connection the surveillance officer saw and whatever conduct that the back-up Bureau of Narcotics officers did totally mistaken as to the conduct of Miss Boston. [sic] All she was there was to pick up her boyfriend.
The issues of fact were well laid out for the jury. The State presented the fact testimony of two officers at the scene, one who had performed the surveillance of defendant and another who had pursued the co-defendant. Eventually, defendant presented countervailing fact evidence through her own testimony and that of other witnesses, including Larisse Frazier, the mother of defendant's boyfriend and aunt of the co-defendant. No drugs were found on or near defendant. She did possess an amount of cash, however.
The State also presented the testimony of Detective Reginald Holloway, an employee of the Bureau of Narcotics in the Essex County Sheriff's Department, who qualified as an expert in the subject matter field of "street level narcotics." The prosecutor propounded a hypothetical question and an elaboration incorporating factual detail recounted in the testimony of the single on-the-scene surveilling officer, including his description of one set of conversations or "transactions" between defendant and another person and between defendant and the co-defendant, and that officer's vague recollection of, possibly, two other sets of conversations or "transactions." In response to the question whether he would "be able to form an opinion as to what took place[,]" Detective Holloway responded in the affirmative. The following colloquy ensued:
Q * * * How is that?
A ... [I]t would lead me to believe, as stated, being that the location is an area known for illegal narcotic activity, I would be under the impression that I just had observed what appeared to be four illegal narcotic transactions.
Q And how do you come to that opinion?
A ... [W]ell based within your hypothetical you made mention of individuals *990 approaching. That is, in the first hypothetical, an individual approaching and engaging in a brief conversation with a female. At which time the female was observed responding to another individual that entered a location returning at a time when items were exchanged.... [T]hat's indicative to what's considered an illegal narcotic transaction.
In response to a further elaboration of the hypothetical to incorporate facts regarding the flight of the co-defendant into the house, and the question: "would that tend to add to your opinion?", Holloway responded: "it would strengthen my opinion that illegal narcotic transactions had taken place." The questioning on this subject went on:
Q Okay. And suppose in addition to the narcotics the police had seized certain amounts of money, which I'll delineate to you right now. If the police had seized from the young woman a total of $92 in the following denominations: Three $20 bills, one $10 bill, five $5 bills and 17 $1 bills.[*] * * * And from the young man they had recovered two $20 bills, two $10 bills, seven $5 bills and nine $1 bills. Do those denominations... and those amounts suggest anything to you?
A Well, ... based on the hypothetical and the observations made within said hypothetical, it would be my overall opinion regarding the total currency from both individuals that the recovered currency were proceeds of illegal narcotic transactions....
Q I see. Is there any significance in the denominations of this case?
A ... [N]ot necessarily. I mean, the overall total, it does allow for ... both individuals to be in access of change for their customers, ranging from $100 denomination on down.... [B]oth the overall total, even though it's separately kept on individuals, it's still considered a dealer's bankroll, the proceeds of illegal narcotic trafficking....
Q Okay. And with regard to the transaction that we originally started out with in the hypothetical, where the young man had disappeared from view and come back and handed something to the young woman, does that suggest any circumstances to you?
A Yes, ma'am.
Q And what would that be?
A ... [T]hat would be that the individual utilized a stash location, a location in the area utilized to conceal the narcotics that were being distributed....
Q And what is the benefit to a person to use a stash location?
A ... [O]nce again, it's the concealment, the hiding of the narcotics, mainly from law enforcement officers, individuals that might look to rob said drug dealers, the competition. And ... many times when a stash location is utilized, individuals feel secure with said location. And while having to respond to another location to retrieve the narcotics that are being distributed, if approached by police officers, many times individuals are under the impression that if the narcotics aren't actually recovered from their person there can't be a connection made to them and said narcotics....
Q Now are you familiar, Detective Holloway, with the area of ... Magnolia Street and Highland Avenue in the City of Newark?
A Yes, ma'am.
Q And how familiar are you with that area?

*991 A ... I'm very familiar with that area.
Q Have you had occasion to conduct investigations in that area?
A Yes, ma'am.
Q I see. Have you had occasion to make arrests in that area?
A Numerous, ma'am, that's correct.
Q And have undercover buys been made in that area?
A ... I have made narcotic purchases from that location myself.
Q Okay. And I want you to further assume that this is the area in which the individuals involved were arrested. Would that strengthen your opinion in any way?
A ... [I]t would strengthen my opinion to the observations that were made within the hypotheticals....
The questioning then turned to the identification of the drugs seized and other issues.
In every significant respect, this case is factually identical with the situation presented in State v. Baskerville, 324 N.J.Super. 245, 735 A.2d 39 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000); see also State v. Singleton, 326 N.J.Super. 351, 741 A.2d 168 (App.Div.1999). Here, as in Baskerville, a police witness testified to his observations of activities that could be construed as one or more illicit drug transactions. Here, as there, no drugs were found on defendant or in any area within her reach. Here, as there, the only potentially incriminating physical evidence that was spatially connected with defendant was the cash found on her person. We held in Baskerville that expert witness testimony opining that "the individual was selling narcotics," id. at 255, 735 A.2d 39, and the like, was impermissible "to fill in the gaps which the direct evidence presented" between the acts recounted and the "ultimate question" of defendant's guilt for a drug crime. Id. at 263-64, 735 A.2d 39. We concluded that the expert's opinions "irredeemably tainted" the ambiguous factual evidence to the extent of creating "a risk of prejudice far outweighing its probative value." Id. at 264, 735 A.2d 39.
Subsequently, in State v. Summers, 176 N.J. 306, 823 A.2d 15 (2003), the Supreme Court upheld a conviction in which the critical hypothetical question answered affirmatively by the expert witness was whether she "ha[d] an opinion as to whether [the defendant] ... possessed [the] drugs [that had been found on his person] for his own use or for distribution?" Id. at 311, 823 A.2d 15. That inquiry was more specific and more focused in respect of the expert's insights, i.e. the indicia of drug trafficking, than were the open-ended questions addressed to the expert here. Moreover, in Summers, the facts established by the police witnesses and unrebutted by the defendant included that the police had found on his person a supply of drugs in "a large bag with smaller bags containing cocaine." Ibid. Those factors combined to create a different balance between probative value and prejudicial effect than had been presented in Baskerville.
In reversing the convictions herein, we emphasize those two factors. First, the ultimate inquiry to the expert in this case was effectively identical to the inquiry in Baskerville, which was tainted by its essential congruence with the factual issue the jury was called upon to resolve. The ultimate inquiry of the expert in Summers was, in both form and context, different. Second, it was clear in Summers that the defendant had possessed the drugs at issue, justifying an affirmance of his conviction for simple possession even in the face of a question as to the validity of other drug-crime convictions, see State v. Summers, 350 N.J.Super. *992 353, 369, 795 A.2d 308 (App.Div.2002)(Kestin, J.A.D., dissenting). Here, a real issue of fact existed about this defendant's connection to the drugs that had been found at some distance after the police had pursued the co-defendant. The State could not properly seek a favorable resolution of the fact issues committed to the jury for resolution by bolstering the testimony of its only fact witness with the opinion of an expert on the ultimate issue. Our observation in Baskerville is especially apt here:
From the totality of the fact-witness testimony alone, the jury had sufficient bases from which to draw inferences in finding whether the State had proved its case for drug distribution. What the State, manifestly, was not entitled to was an enhanced proof opportunity, through expert opinion on the ultimate question, to salvage a potentially insufficient case. The circumstances at this trial were different from the more typical situation in a possession-with-intent-to-distribute case, where a police expert gives the jury a basis for determining more recondite questions, such as whether the quantity of drugs, the manner in which they were packaged, and other factors suggest an intent to distribute. There was nothing arcane about the question before this jury: Did defendant distribute drugs or not? Apart from furnishing expert assistance in understanding the incidents of drug trafficking, the State was not entitled to give the jury a non-factual basis for reaching a verdict on this entirely factual question. The fact-witness testimony should have spoken for itself. In the State's attempt to fill the unmistakable gaps in that testimony, and to strengthen the obvious weaknesses of its case, the prosecution could not validly suggest, through its expert witness, stronger inferences regarding the ultimate question than the fact testimony itself would support. In doing so, the State added an irredeemable element of undue prejudice to the trial.
In sum, on the simpleup or downfactual issue in this case, the jury needed no assistance from an expert witness. The testimony of the State's fact witnesses... was either adequate to lead to a guilty verdict or it was not. The jury was free to base its determination on the facts developed and the fairand ordinaryinferences which could be drawn from those facts that tended to establish defendant's guilt on the distribution charges. Or, the jury could focus on the facts that the drugs in evidence came from [another] and that there was no direct evidence connecting those drugs to defendant. The jury, by a process of fair inference based on common knowledge and good sense, enhanced by general background information which the expert witness could properly provide, was well equipped, without further assistance, as it found the evidence persuasive, to fill in the gaps which the direct evidence presented. Given the existence of those gaps, however, [the expert's] opinions on the ultimate question could not fairly and reasonably supply the missing, and necessary, connection. Accordingly, we conclude that the convictions cannot stand because, with the introduction of those opinions, an essential aspect of the proofs became irredeemably tainted by a risk of prejudice far outweighing its probative value. See N.J.R.E. 403.
[Baskerville, supra, 324 N.J.Super. at 262-64, 735 A.2d 39.]
We remain committed to preserving the integrity of the trial as a search for truth.
The convictions are vacated and the matter is remanded for a new trial.
NOTES
[*] The verbatim record is accurately quoted, including the arithmetic inconsistency between the detailed description of the bills seized and the total given.