61 A.3d 882

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RALPH SOWELL, DEFENDANT–APPELLANT.

Argued September 24, 2012—Decided January 14, 2013.

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Jane Deaterly Plaisted,* Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (*Carolyn A. Murray,* Acting Essex County Prosecutor, attorney; *Ms. Plaisted* and *Debra G. Simms,* Special Deputy Attorney General/ Assistant County Prosecutor, on the briefs).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Jeffrey S. Chiesa,* Attorney General, attorney).

Chief Justice RABNER delivered the opinion of the Court.

This criminal appeal addresses the limits of the use of expert testimony at drug trials. The case involves a simple factual allegation about a visit to an inmate at a state prison. At trial, the State presented proof that the visitor handed an object to the inmate, who placed it in a bag of potato chips. To divert attention, the inmate appeared to kiss the visitor during the transfer. Minutes later, officers searched the bag of chips and found heroin in it.

Both the inmate and the visitor were later charged with narcotics offenses. In his defense at trial, the inmate disputed the facts and claimed that no drug transfer took place. In addition to other strong proofs offered at trial—eyewitness testimony by an officer who observed the transfer, a video of the meeting, and defendant's post-arrest admission that he received drugs during the visit—the State presented expert testimony that lies at the heart of this appeal. Specifically, in response to a hypothetical question that tracked some of the above facts, an expert told the jury that "an exchange of narcotics took place."

Expert testimony plays an important role in many criminal trials. It helps jurors understand complicated concepts and subjects with which they are not familiar. But the straightforward factual allegation in this case was not beyond the understanding of the average juror. It was therefore improper for the State to introduce expert testimony on the point. The testimony invaded the jury's role as the ultimate fact finder. It was also error for the expert to volunteer additional facts in response to a specific hypothetical.

Because we rely on jurors, not experts, to decide straightforward but disputed facts, we caution prosecutors not to attempt to introduce the type of problematic expert testimony offered in this

case. We also urge trial judges, in their role as gatekeepers, to prevent juries from hearing such evidence.

It is only because of the overwhelming evidence of defendant's guilt that we do not reverse his conviction.

## I.

On January 10, 2004, Bonita Pitt visited defendant Ralph Sowell, an inmate at Northern State Prison. The visit took place in the prison gymnasium in an area monitored by security cameras. At the time, Sergeant Salvatore D'Amico of the Department of Corrections (DOC) was at work watching the cameras from a remote location known as central control.

We rely on the evidence at trial for the following summary. D'Amico testified that he observed what he believed was a drug transaction between Pitt and defendant. D'Amico saw Pitt and defendant, who were seated in chairs, lean forward toward one another. At the same time that defendant appeared to kiss Pitt on the cheek, she lifted her shirt slightly, reached into her left front pocket, took out an item, and placed it in defendant's hand. D'Amico then saw defendant lean back and place the item into a bag of potato chips.

D'Amico immediately radioed DOC Lieutenant Blevins and asked him to seize defendant and the bag of chips. When Blevins approached defendant, D'Amico, still monitoring the live feed on the security cameras, saw defendant place the bag of potato chips under the seat next to him.

D'Amico watched Blevins take defendant into custody. D'Amico also saw another officer search the area and recover the bag of chips. D'Amico then went to the gymnasium area and, in the presence of the other officers and defendant, emptied the contents of the bag of chips. A balloon and some potato chips fell out. Inside the balloon was a second balloon containing thirty "decks" of heroin. According to expert testimony that is not in dispute, packages like the thirty glassine envelopes seized have a value of

$30 to $40 each in prison. One glassine is usually broken down into three separate packets, commonly known as "hits," and then distributed.

Leonard Randolph, an investigator with the DOC, then got involved in the investigation. He interviewed both Pitt and defendant separately. After Pitt waived her rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), she admitted that the balloons contained heroin and that a man named Kevin agreed to pay her $100 to bring the balloons into the jail.

Defendant also made admissions to Randolph. After waiving his *Miranda* rights, defendant said that he received drugs during the prison visit.

On July 26, 2004, an Essex County Grand Jury charged defendant and Pitt in a three-count indictment with third-degree conspiracy to possess and to possess with intent to distribute heroin, *N.J.S.A.* 2C:5–2, third-degree possession of heroin, *N.J.S.A.* 2C:35–10a(1), and third-degree possession of heroin with intent to distribute, *N.J.S.A.* 2C:35–5a(1) and b(3).[1]

At trial, during D'Amico's testimony, the State played the videotape recording of the entire interaction between Pitt and defendant, up to and including defendant's seizure and the recovery of the bag of potato chips. D'Amico testified that he watched the visit as it took place through television monitors, and that the quality of the video feed in real-time was "crystal clear." He explained that the live image was clearer than the video recording shown to the jury.

The State also presented testimony by Manuel Alfonso, a DOC investigator. Based on his training and experience, the trial court accepted Alfonso as a qualified expert in the area of "narcotics investigation ... as well as packaging, street and prison value, and distribution."

---

[1] Defendant Sowell and Pitt were tried together as co-defendants. The jury found Pitt guilty of conspiracy and possession but acquitted her of possession with intent to distribute. Pitt's conviction is not part of this appeal.

Alfonso testified about the value of heroin inside the Northern State Prison, how heroin is packaged, how drugs might be smuggled into prison, and how uncommon it would be for a user—and not a seller—to have thirty envelopes of heroin in prison. He also explained the concept of a "stash"—a place people hide drugs to avoid detection.

On direct examination, the State posed a specific hypothetical and asked Alfonso to offer an expert opinion. Because that testimony is at the heart of defendant's appeal, we quote it at length:

Q [by the Prosecutor]: Okay. Officer, I'm going to provide you with a hypothetical and I would ask that you assume that the facts are true for purposes of this hypothetical. Okay.

An officer observes subject A sitting across from subject B. Subject B reaches into a pocket. Subject A has a bag of potato chips in their hand. Both subject A and subject B lean forward. Subject A has the bag of chips wide open. Subject B leans forward and drops the item that's in the hand into the bag of chips. Both subjects then lean back into their original positions. Subject A looks inside the bag and continues—and continues in—in his or her original position. Can you render an opinion?

A [by Alfonso]: Yes, I can.

Q: Okay. And what is that opinion?

A: That an exchange of narcotics took place.

Q: And what is the basis of that opinion?

A: Well, I base that on the facts that you've given. Mostly the covert act of kissing, and then moving the hand at the same time in order to draw attention away from the hand. The placement of the bag in—in between the legs, and the hand dropping something into the bag, and then the nonchalant attitude, I guess, of them backing off.

Q: Detective, building on that hypothetical, if subject A and B both lean back into their original positions and subject A, observing an officer approaching, places the bag underneath the seat next to him. Can you render an opinion?

A: Yes.

Q: And what is that?

A: That the subject was attempting to get rid of the stash.

Q: Investigator, further building on that hypothetical, if upon an inspection of that bag, there is a balloon within a second balloon containing 30 decks of heroin, can you render an opinion?

A: Yes.

Q: And what is that opinion?

A: That a transaction or an exchange of narcotics took place, and was enclosed in the perfect packaging for introduction.

Defendant did not object to Alfonso's testimony.

Neither defendant nor Pitt testified at trial. Defendant called another prison inmate as a witness, who testified that he sat next to defendant and Pitt during the visit and did not see them exchange anything. Another defense witness testified that when defendant was detained, other people in the area panicked and threw objects away.

Throughout the trial, the defense challenged the State's version of events. At various points during cross-examination, the defense suggested that defendant and Pitt were merely stealing a kiss, which was against prison regulations. In closing argument, defense counsel argued that the tape did not reveal what D'Amico claimed he saw. The best evidence, defendant contended, came from the inmate seated next to defendant, who saw nothing exchanged. Counsel also attacked the credibility of the State's witnesses.

At the close of arguments, the trial court instructed the jury about the role of expert testimony and the weight it should be given. Consistent with the model jury charge, the court told the jurors that they were not bound by the expert's opinion and that the ultimate issue of defendant's guilt was for them alone to decide.

On April 12, 2005, the jury found defendant guilty of all three counts. At sentencing, on May 27, 2005, the judge merged the conspiracy and possession offenses into the third-degree charge of possession of heroin with intent to distribute. The court then sentenced defendant to an extended ten-year term of imprisonment with five years of parole ineligibility.

The Appellate Division affirmed defendant's conviction and sentence but found part of the expert's testimony improper. The panel explained that "most of the hypothetical questions called for opinions that an average juror can form without the need for expert testimony." In particular, the panel noted that jurors

could determine whether an exchange of drugs took place and whether defendant discarded a bag of potato chips to get rid of a stash without expert testimony. By contrast, the panel concluded that expert testimony about how the drugs were packaged was proper. The panel also found that it was not error for the expert to incorporate facts outside the hypothetical in his answer, because the additional facts were in evidence.

Despite the improper testimony, the panel affirmed the conviction under the plain error standard in light of the strength of the other evidence at trial. The Appellate Division denied defendant's two motions for reconsideration.

On October 24, 2011, we granted defendant's petition for certification. 208 *N.J.* 371, 29 *A.*3d 743 (2011).

## II.

Defendant argues that the trial court committed reversible error by admitting Alfonso's expert opinion testimony. Defendant contends that the evidence exceeded the permissible scope of expert testimony because it constituted an opinion of guilt on a matter not beyond the ken of an ordinary juror. Defendant also claims that it was error for the expert to base his answer to a hypothetical on facts that were not contained in the question. By doing so, defendant claims, the expert appeared to render an opinion based on his knowledge of the case and not the hypothetical. Finally, defendant argues that the errors require reversal because the expert testimony contaminated the other proofs and essentially told the jury what was depicted on the videotape.

The State contends that the expert testimony was properly admitted in evidence. According to the State, the case involved "a highly nuanced technique" to conceal the transfer of drugs in prison, and not a straightforward exchange. Because defendant and Pitt knew that they were being monitored, the State submits that their exchange was a "carefully planned clandestine transaction" about which an average juror would have no knowledge. According to the State, expert testimony was needed to enlighten

the jury and help it interpret the meaning of furtive gestures and subtle actions. In addition, the State claims that expert testimony properly enhanced the jury's understanding of the videotape. The State also argues that the expert's response to the hypothetical was proper because it was based on evidence already adduced at trial.

In the alternative, the State agrees with the Appellate Division's finding that the expert's testimony did not constitute plain error. The State points to other evidence of defendant's guilt including the videotape, D'Amico's testimony, and defendant's confession.

The Attorney General, appearing as amicus curiae, also argues that there was a compelling need for expert testimony in this case because of the special circumstances surrounding the transfer of drugs in a prison setting. The Attorney General maintains that the average juror has no familiarity with the subject.

At oral argument, both the State and the Attorney General vigorously defended the use of expert testimony in this case.

III.

A.

We begin with the rules of evidence to determine the proper uses and limits of expert testimony. Under *Rule* 702, a qualified expert may testify and offer an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *N.J.R.E.* 702. In other words, to be admissible, expert testimony should "relate[ ] to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge." *State v. Odom,* 116 *N.J.* 65, 71, 560 *A.*2d 1198 (1989). If the matter is within the competence of the jury, expert testimony is not needed. *Id.* at 76, 560 *A.*2d 1198.

As gatekeepers, trial judges must ensure that expert evidence is both needed and appropriate, even if no party objects to

the testimony. *State v. Nesbitt,* 185 *N.J.* 504, 515, 888 *A.*2d 472 (2006). Although expert testimony may "embrace[ ] an ultimate issue to be decided by the trier of fact," *N.J.R.E.* 704, the testimony can be excluded if "the risk of . . . undue prejudice, confusion of issues, or misleading the jury" substantially outweighs its probative value, *N.J.R.E.* 403.

A number of recent cases have canvassed this area of law. *See, e.g., State v. McLean,* 205 *N.J.* 438, 16 *A.*3d 332 (2011); *State v. Reeds,* 197 *N.J.* 280, 962 *A.*2d 1087 (2009); *Nesbitt, supra,* 185 *N.J.* 504, 888 *A.*2d 472; *Odom, supra,* 116 *N.J.* 65, 560 *A.*2d 1198. Those decisions and others have identified areas that lend themselves to expert testimony in drug trials. For example, we do not expect ordinary jurors to understand the difference between drugs possessed for distribution as opposed to personal use, or how drug traffickers package and distribute illegal drugs. In *Odom,* as a result, the Court allowed expert testimony on those subjects and explained that jurors typically benefit from expert insight into the "properties, packaging, and value of illegal drugs." *Odom, supra,* 116 *N.J.* at 69, 71, 76, 560 *A.*2d 1198; *see also State v. Summers,* 176 *N.J.* 306, 315–17, 823 *A.*2d 15 (2003) (allowing expert testimony that distinguished between possession and distribution).

In appropriate cases, experts may also testify about the roles that participants play in street-level drug transactions, such as "why drug dealers use juveniles as 'mules' to carry drugs." *State v. Berry,* 140 *N.J.* 280, 301–02, 658 *A.*2d 702 (1995). Similarly, we have admitted expert testimony to explain how a person's actions fit into a drug distribution scheme when the defendant had no personal contact with the drugs or money exchanged. *Nesbitt, supra,* 185 *N.J.* at 515, 888 *A.*2d 472. In those and other areas, we recognized that an expert could help the jury assess evidence it was generally unfamiliar with.

However, the case law makes clear that it is not proper to present expert testimony about straightforward but disputed facts. *McLean, supra,* 205 *N.J.* at 455, 16 *A.*3d 332 (citing *State v. Boston,* 380 *N.J.Super.* 487, 494, 882 *A.*2d 987 (App.Div.2005),

*certif. denied,* 186 *N.J.* 243, 892 *A.*2d 1290 (2006)). In *Nesbitt,* this Court cited with approval several Appellate Division decisions that barred expert testimony about clear-cut matters that average jurors could understand. *Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472. In one of the cases cited, *State v. Baskerville,* 324 *N.J.Super.* 245, 247–48, 735 *A.*2d 39 (App.Div.1999), the police observed a defendant have a conversation with a woman, walk to a car, grab a paper bag from underneath the car, remove something from the bag, and exchange the item with the woman for what appeared to be money. Soon after, the police witnessed a second, similar transaction and pursued the potential purchaser. *Id.* at 248–49, 735 *A.*2d 39. As the police approached him, the purchaser dropped nine vials of cocaine. *Id.* at 249, 735 *A.*2d 39. The defendant had $897 in cash on him when he was arrested immediately afterward, but no drugs were found either on him or near the car. *Id.* at 250, 735 *A.*2d 39.

Another decision cited in *Nesbitt, State v. Singleton,* 326 *N.J.Super.* 351, 353, 741 *A.*2d 168 (App.Div.1999), also involved a simple set of facts: The police saw a defendant remove an object from his sock and exchange the item with a woman for cash. When the police arrested the defendant, they found four vials of cocaine in his sock. *Ibid.* The woman had walked away. *Ibid.*

In both *Baskerville* and *Singleton,* the prosecution presented the testimony of a narcotics expert who responded to hypothetical questions that mirrored the above respective facts. In each case, the expert opined that a person whose behavior tracked the defendant's was selling drugs. *Baskerville, supra,* 324 *N.J.Super.* at 255, 735 *A.*2d 39; *Singleton, supra,* 326 *N.J.Super.* at 353, 741 *A.*2d 168.

Both appellate panels concluded that the expert testimony was impermissible. *Baskerville, supra,* 324 *N.J.Super.* at 263–64, 735 *A.*2d 39; *Singleton, supra,* 326 *N.J.Super.* at 354, 741 *A.*2d 168. In *Baskerville,* the panel explained that

[t]here was nothing arcane about the question before this jury: Did defendant distribute drugs or not? Apart from furnishing expert assistance in understanding

the incidents of drug trafficking, the State was not entitled to give the jury a non-factual basis for reaching a verdict on this entirely factual question. The fact-witness testimony should have spoken for itself. . . .

In sum, on the simple—up or down—factual issue in this case, the jury needed no assistance from an expert witness. . . . The jury was free to base its determination on the facts developed and the fair—and ordinary—inferences which could be drawn from those facts. . . . The jury, by a process of fair inference based on common knowledge and good sense, enhanced by general background information which the expert witness could properly provide, was well equipped, without further assistance, . . . to fill in the gaps which the direct evidence presented. [*Baskerville, supra,* 324 *N.J.Super.* at 263, 735 *A.*2d 39.]

In both cases, no expert was needed to explain what the jury could grasp on its own: whether or not a drug transaction had occurred.

A more recent appellate decision made the same point. In *State v. Thompson,* 405 *N.J.Super.* 76, 78, 963 *A.*2d 380 (App.Div.), *certif. denied,* 199 *N.J.* 133, 970 *A.*2d 1049 (2009), an undercover officer observed a defendant exchange an item later identified as heroin for cash. Among other proofs, the State called an expert and posed a hypothetical question that summarized the evidence. *Id.* at 80–82, 963 *A.*2d 380. In response, the expert opined that a sale of heroin had taken place. *Id.* at 81, 963 *A.*2d 380. The appellate panel found "[t]he question was improper because it was well within the competence of the jury to answer without the aid of expert opinion evidence." *Id.* at 83–84, 963 *A.*2d 380.

As we cautioned in *Nesbitt* and reiterate here, our case law "does not license the use of a narcotics expert to tell a jury that which is obvious." *Nesbitt, supra,* 185 *N.J.* at 514, 888 *A.*2d 472. Expert testimony should be limited to areas that are beyond the understanding of the jury. It is not appropriate to summarize straightforward but disputed evidence in the form of a hypothetical and then elicit an expert opinion about what happened. That approach improperly bolsters the State's proofs with expert testimony and can usurp the jury's sole responsibility to find the facts. "[E]xperts may not intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out without expert assistance. . . ." *McLean, supra,* 205 *N.J.* at 461, 16 *A.*3d 332.

B.

If expert testimony is warranted, the rules of evidence and case law offer guidance about how it should be presented. Under the rules, an expert can base an opinion on facts or data "perceived by or made known to the expert at or before the hearing." *N.J.R.E.* 703. A court may require the use of a hypothetical to elicit expert opinion testimony, and may direct the expert to disclose the underlying facts and data that form the basis for the opinion. *N.J.R.E.* 705.

■■ The Court's decision in *Odom* and its progeny provide further direction. Experts cannot opine directly about a defendant's guilt or innocence. *Odom, supra,* 116 *N.J.* at 79, 560 *A.*2d 1198. They cannot express an opinion on the credibility of a witness or party. *State v. Vandeweaghe,* 177 *N.J.* 229, 239, 827 *A.*2d 1028 (2003); *State v. Frisby,* 174 *N.J.* 583, 594–95, 811 *A.*2d 414 (2002); *State v. Jamerson,* 153 *N.J.* 318, 341, 708 *A.*2d 1183 (1998). They should also refrain from mimicking the precise language of a statute, to the extent possible, to avoid offering legal conclusions. *Reeds, supra,* 197 *N.J.* at 297–98, 962 *A.*2d 1087 (finding plain error when expert testified that defendants "constructive[ly] possess[ed] [drugs] with the intent to distribute"); *see also Odom, supra,* 116 *N.J.* at 79, 82, 560 *A.*2d 1198.

■ *Odom* permits the use of carefully phrased hypothetical questions in drug cases. *Odom, supra,* 116 *N.J.* at 81, 560 *A.*2d 1198. After the State has presented relevant evidence— including expert testimony about subjects beyond the understanding of the jury—the prosecution may pose a hypothetical that refers only to the evidence and testimony before the jury. *Ibid.* The defendant's name may not be used in the question or response. *Id.* at 82, 560 *A.*2d 1198. In addition, the expert should provide a basis for the opinion expressed, which may only reflect the facts in evidence. *Ibid. Odom* also directs that when trial judges instruct the jury about the weight to be given expert

testimony, courts should emphasize that only the jury can make the ultimate decision about a defendant's guilt or innocence. *Ibid.*

The above precautions are intended to avoid expert testimony, and responses to hypotheticals, that usurp "the jury's role by essentially telling the jurors how to resolve a case." *Reeds, supra,* 197 *N.J.* at 292, 962 *A.*2d 1087 (citations omitted). For that reason, as noted earlier, even if a defendant does not object, the trial judge has the responsibility both to exclude unnecessary, inadmissible expert testimony and to monitor the use of hypothetical questions when the testimony is warranted. *Nesbitt, supra,* 185 *N.J.* at 514–15, 888 *A.*2d 472.

## IV.

### A.

Tested under the above standards, parts of the expert's testimony were appropriate. We do not expect that average jurors will understand the value of heroin, how it is packaged, how drugs are smuggled into prison, or whether thirty envelopes of heroin reflect distribution or personal use. The expert's testimony on those subjects was proper.

The hypothetical posed and the expert's responses, however, should not have been permitted. This is not a close question. Stripped to the core, the jury heard evidence that one person handed an object to another, who placed it in a bag of potato chips in which officers found heroin moments later. Those facts were in dispute, but they were not hard to grasp. An average juror did not need expert testimony to decide whether Pitt transferred drugs to defendant. Because our system of justice relies on jurors to decide straightforward factual disputes, and because nothing about the contested episode was beyond the ken of the average juror, expert testimony about the nature of the transaction was neither warranted nor proper. It inappropriately rein-

forced Sergeant D'Amico's account of what he saw and encroached on the jury's fact-finding role.

The State claims that defendant's attempt to conceal the exchange during a prison visit—by kissing Pitt on the cheek during the transfer—turned this into a "highly nuanced" situation that called for expert testimony. Nearly all criminal activity involves some effort at concealment. To avoid being caught, criminals routinely try to hide their unlawful acts. That fact, by itself, does not necessarily justify expert testimony. When defendants try to conceal criminal behavior as part of an elaborate scheme—like a sophisticated narcotics distribution or gambling operation in which different individuals play compartmentalized roles—expert testimony can help jurors understand how both the network and the individual defendants who comprise it operate. But a straightforward transaction in which one person receives a packet of drugs from another and hides it in a bag of chips requires no expert interpretation, even if the parties try to distract observers by kissing as they transfer the drugs. Jurors are able to assess that type of behavior on their own, based upon common knowledge, experience, and logic.

The quality of the proofs also does not invite expert testimony in this case. The video the jury saw was a frame-by-frame recording, which created a stutter step in between each motion. At oral argument, the State claimed the video was hard to view and might require several viewings for jurors to follow the transaction. That may be true, but it did not justify expert testimony. There were various ways in which the prosecution could, and did, address the issue. D'Amico pinpointed the transfer during his testimony while the prosecution played the video. In summation, the prosecution encouraged the jury to view the video again and highlighted which parts the jurors should watch. Those comments were appropriate. But the prosecution cannot call an expert to fill in gaps and clarify a transaction that jurors can understand on their own. Only the jury could decide what the video depicted. The quality of the video did not make the facts

more complicated.[2]

The State also seeks to justify the use of the hypothetical on the grounds that it enlightened the jury about how illicit drugs are transferred in a prison setting. The State contends that average jurors do not understand prison protocols and security issues. The offending hypothetical, though, did not address those issues. It simply focused on a straightforward transfer between two people. Regardless, the essence of the transfer did not become harder to follow because it took place in a prison gymnasium. As a result, it would not change the outcome in this case if the hypothetical question had referred to a prison setting.

B.

The expert's testimony raised concerns for another reason as well. The prosecutor posed a hypothetical that included certain facts and asked for an opinion about those particular facts:

> An officer observes subject A sitting across from subject B. Subject B reaches into a pocket. Subject A has a bag of potato chips in their hand. Both subject A and subject B lean forward. Subject A has the bag of chips wide open. Subject B leans forward and drops the item that's in the hand into the bag of chips. Both subjects then lean back into their original positions. Subject A looks inside the bag and continues—and continues in—in his or her original position. Can you render an opinion?

In response, the expert opined "[t]hat an exchange of narcotics took place." As the basis for his opinion, however, the expert referred to facts not contained in the question. Those facts instead came from other evidence about defendant's conduct. Specifically, in addition to the facts in the hypothetical, the expert's opinion relied on "the covert act of kissing," "moving the hand at the same time in order to draw attention away from the hand," and "the placement of the bag in between the legs."

---

[2] We do not suggest that the State cannot retain experts to enhance the quality of recordings and then testify about that process. *See, e.g., United States v. Carson,* 969 *F.*2d 1480, 1500 (3d Cir.1992).

██ *Rule* 703 permits experts generally to base an opinion on facts "perceived by or made known to the expert at or before the hearing." *N.J.R.E.* 703. The use of hypothetical questions, though, requires great care. To be sure, the question must be limited to the facts presented at trial. *Summers, supra,* 176 *N.J.* at 314, 823 *A.*2d 15 (citing *Odom, supra,* 116 *N.J.* at 80–82, 560 *A.*2d 1198). Beyond that, the expert's answer should be limited to the facts contained in the hypothetical. *McLean, supra,* 205 *N.J.* at 455, 16 *A.*3d 332 (citing *Summers, supra,* 176 *N.J.* at 314–15, 823 *A.*2d 15; *Odom, supra,* 116 *N.J.* at 79–83, 560 *A.*2d 1198); *see also Reeds, supra,* 197 *N.J.* at 293, 962 *A.*2d 1087 (noting expert may respond to hypothetical and express opinion "based on those facts").

██ If an expert volunteers additional facts—which the jury knows relate to the acts of the defendant on trial from other evidence—the veneer of the hypothetical fades, and it can easily appear to the jury that the expert is opining directly about defendant's conduct. Thus, in response to precisely worded hypotheticals, experts should limit their answers to the questions posed and wait for follow-up questions.

V.

██ It is only because of the overwhelming evidence of defendant's guilt that we do not reverse his conviction. Sergeant D'Amico observed Pitt transfer an item to defendant, saw her put it in defendant's hand, and watched as defendant put the item into a bag of potato chips. A video captured the exchange as well. Immediately afterward, officers seized the bag and found thirty decks of heroin inside it. In addition, defendant admitted that he received drugs during the visit.

As a result, the erroneous admission of expert testimony about the transfer was not plain error. We cannot find that the error was "clearly capable of producing an unjust result," *R.* 2:10–2, or that the error "led the jury to a verdict it otherwise might not have reached," *State v. R.B.,* 183 *N.J.* 308, 330, 873 *A.*2d 511 (2005)

(quoting *State v. Bankston,* 63 *N.J.* 263, 273, 307 *A.*2d 65 (1973)). That determination must be made in the context of the entire record. *See State v. Marshall,* 123 *N.J.* 1, 200, 586 *A.*2d 85 (1991). But for that, we would not affirm the conviction here.

The outcome should not undermine the importance of this case. The expert's testimony was improper. Settled law does not permit the State to recast straightforward evidence in the form of a hypothetical and elicit an opinion as to what it reflects. Such testimony inappropriately encroaches on the jury's responsibility to decide disputed facts and determine whether the State has proven the charges against a defendant. In the future, we urge trial judges, in their role as gatekeepers, to be vigilant and bar this type of testimony.

## VI.

For the reasons set forth above, we affirm the judgment of the Appellate Division as modified.

Justices LaVECCHIA, ALBIN, HOENS, and PATTERSON join in Chief Justice RABNER's opinion.

*For Affirmed as Modified*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON—5.

*Opposed*—None.