RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0482-15T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

EDWARD A. GAJDEROWICZ,

 Defendant-Appellant.

________________________________________________________________

 Submitted April 4, 2017 – Decided August 15, 2017

 Before Judges Messano and Espinosa.

 On appeal from the Superior Court of New
 Jersey, Law Division, Burlington County,
 Indictment No. 14-03-0163.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Tamar Y. Lerer, Assistant
 Deputy Public Defender, of counsel and on the
 briefs).

 Scott A. Coffina, Burlington County
 Prosecutor, attorney for respondent (Alexis R.
 Agre, Assistant Prosecutor, of counsel and on
 the brief).

PER CURIAM
 Defendant appeals from his conviction for second-degree

attempted luring, N.J.S.A. 2C:13-6, of fourteen-year-old S.D. We

affirm.

 I.

 The facts underlying the offense begin in February 2013, when

defendant, then twenty-one-years old, had contact with fourteen-

year-old S.D. through a web game called Ruzzle. This was not the

first interaction between defendant and S.D. They became friends

on Facebook approximately two months earlier. S.D.1 did not know

defendant personally but knew his brother, a fellow freshman in

her high school class. S.D.'s mother, A.R., testified she sent

defendant a message from her own Facebook account in December

2012, instructing him to delete her daughter as a friend and not

to communicate with S.D. again or she would go to the police.

 Ruzzle has a chat function that permits players to chat while

playing the game. In February 2013, she began to chat with

defendant through this chat function. At her mother's request,

S.D. asked defendant how old he was. This exchange followed:

 Defendant: I'm 21. U

 S.D.: 14

 Defendant: Oh. You don’t look 14

1
 S.D. was called as a witness for the defense and added little
to the evidence.

 2 A-0482-15T4
 S.D.: LOL. Do you know Paul [E].

 Defendant: I don’t think so. You wanna
 just text, LOL

 S.D.: What's your number

 Defendant: 856-535-XXXX, just make sure
 you put your name so [I know]
 who it is

 S.D.: LOL again, I'm only 14, you
 don’t care?

Defendant responded, "Not unless you try to get me in trouble and

you don’t care that I'm 21." After this exchange, S.D. had no

further contact with defendant. She did not play Ruzzle with him

again and did not text him.

 A.R., S.D.'s mother, testified that S.D. came to her on the

evening of February 5, 2013, and told her that a man was trying

to contact her through Ruzzle. S.D. said, "I don’t want to deal

with it. I told him I'm 14 years old and he still wants me to

contact him."

 A.R. reviewed the chat exchanges and then used her cell phone

to text defendant at the number he had provided. She did not

identify herself, only opening the exchange with "Hey." A.R.

testified defendant believed she was S.D. and began "communicating

as a friendly chat at first." The issue of age came up again,

with defendant stating he was twenty-one and "S.D." (A.R.) stating

 3 A-0482-15T4
she was fourteen. Defendant did not give his name but sent her

three or four pictures of himself.

 Defendant started texting A.R.'s phone the following morning.

There was an exchange of text messages that day that included

defendant's question, "Do you have a problem with my age." Posing

as S.D., A.R. replied, "no, but my mom would. LOL." In text

messages that followed, defendant cautioned, "Like never say to

anyone how old I am . . . and . . . make sure nobody would find

out who would tell," "people who can get me in trouble." A.R.

responded, "Told you I was 14. You're 21. Why would you get in

trouble." Defendant answered, "under age," and then, "never mind.

Just don’t let your mom or hardly anyone know, LOL."

 The continuing text messages include:

 Defendant: What's the oldest guy you
 dated?

 A.R.: 16

 Defendant: How many guys have you slept
 with?

 A.R.: One, Y?

 Defendant: Just asking questions.

 A.R.: How many younger girls have you
 been with?

 Defendant: Send me some pix

 4 A-0482-15T4
 Defendant eventually answered, "two" younger girls and gave

their ages as 16 and 17. He asked again for pictures and A.R.

responded, "You know what I look like," referring to the fact that

defendant had "friended" S.D. on Facebook two months earlier.

 Later in the afternoon, at a time when S.D. would be home

from school, defendant sent a text suggesting, "maybe we can meet

up or something." At that point, A.R. decided to go to the police.

She was concerned because she had told defendant several times

that she was underage. She texted to defendant, "I have to wait

till my mom leaves." He asked, "where's a good spot," and when

A.R. asked him to pick, he selected a restaurant within walking

distance of her house. He followed that with texts, "how long we

have to hang out," and "or should I say how long can you stay

out."

 On the following day, A.R. kept S.D. home from school and

returned to the police department. She continued to exchange text

messages with defendant.

 In the text exchanges, defendant asked why "S.D." had cut

school. A.R. replied, "you wanted to meet up and I couldn’t last

night. I thought we were gonna have fun." When defendant asked,

"what kind of fun do you want," she said, "you asked me how many

people I slept with, I thought that's what you meant by fun-ness."

Defendant asked, "well do you want to?" "S.D." suggested meeting

 5 A-0482-15T4
at the benches across from the library and that they could go to

her house because her mother was at work. Defendant asked her,

"prove to me that you want it." When she asked how she could

prove it, he said, "send me a pic." She asked what he wanted to

see. He replied, "everything." When she replied "LOL, in person,"

he asked for "Pic of your pussy then." She answered that he would

"see it soon enough."

 Defendant was arrested at the designated meeting spot and

returned to the Medford Police Department. After receiving

Miranda2 warnings from Detective William Knecht, he agreed to speak

with police. Defendant maintained he intended to meet with S.D.

to warn her of the dangers of communicating and meeting with

persons she met online and that he had no intention to have sex

with her. He stated he brought his dog to the meeting, knowing

she was allergic to dogs, because he did not plan to be alone with

her. The videotaped interview was played for the jurors.

 Defendant elected not to testify at trial. His girlfriend,

with whom he has a child, testified and gave her opinion that he

is a truthful person.

2
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).

 6 A-0482-15T4
 Defendant presents the following arguments for our

consideration in his appeal:

 POINT I

 THE TRIAL COURT'S FAILURE TO ISSUE
 ANY PRELIMINARY CHARGE TO THE JURY
 ON FUNDAMENTAL LEGAL PRINCIPLES,
 COMBINED WITH THE STATE'S
 MISSTATEMENT OF THE LAW LESSENING
 ITS OWN BURDEN OF PROOF, DEPRIVED
 DEFENDANT OF DUE PROCESS AND A FAIR
 TRIAL AND NECESSITATES REVERSAL OF
 HIS CONVICTION. (NOT RAISED BELOW).

 POINT II

 THE POLICE OFFICER'S LAY OPINION
 TESTIMONY THAT HE BELIEVED THAT THE
 DEFENDANT HAD THE INTENT NECESSARY
 TO COMMIT THE CHARGED OFFENSE AND
 HAD IN FACT COMMITTED THE OFFENSE
 WAS INADMISSIBLE AND NECESSITATES
 REVERSAL OF DEFENDANT'S CONVICTION.
 (NOT RAISED BELOW).

 "The jurisdiction of appellate courts rightly is bounded by

the proofs and objections critically explored on the record before

the trial court by the parties themselves." State v. Robinson,

200 N.J. 1, 19 (2009). Because both arguments are raised for the

first time on appeal, our review is limited to "a search for plain

error," State v. Nesbitt, 185 N.J. 504, 516 (2006), that is, an

error that is "clearly capable of producing an unjust result," R.

2:10-2. After reviewing defendant's arguments in light of the

 7 A-0482-15T4
record and applicable legal principles, we conclude neither

alleged error was clearly capable of producing an unjust result.

 II.

 After the jury was sworn, the trial judge provided them with

preliminary instructions that did not cover all the topics included

in the Model Criminal Jury Charge, "Instructions After Jury is

Sworn" (2012). Defendant argues the trial judge committed plain

error in failing to instruct the jury on the presumption of

innocence and the burden of proof and that this error was

exacerbated by alleged misstatements by the State in its opening

statement.

 In his opening statement, the prosecutor discussed the

presumption of innocence, describing it as "vital to our system"

and that he expected the jurors to adhere to their oath. He also

said there was a "flip side," that the jurors had "promised to

give the State a fair shake" and were required to give "a fair

shake" to both the defendant and the State. There was no objection

to this statement and no argument is presented on appeal that

defendant was prejudiced by this comment. Still, defendant

contends the prosecutor's comment left the erroneous impression

that the jury had to apply the same burden to both the State and

the defendant.

 8 A-0482-15T4
 There was no objection to the preliminary instructions given

and defendant concedes the trial court's final charge included

appropriate instructions regarding the presumption of innocence

and the State's burden to prove guilt beyond a reasonable doubt.

 [M]odel jury charges should be followed and
 read in their entirety to the jury. The
 process by which model jury charges are
 adopted in this State is comprehensive and
 thorough; our model jury charges are reviewed
 and refined by experienced jurists and
 lawyers.

 [State v. R.B., 183 N.J. 308, 325 (2005).]

 We do not condone the trial court's failure to give the jury

the entire preliminary instruction before commencing the trial.

But, we note the failures to object to either the preliminary

charge or the prosecutor's opening statement strongly suggest that

defense counsel did not perceive any prejudice at the time. State

v. Docaj, 407 N.J. Super. 352, 370 (App. Div.), certif. denied,

200 N.J. 370 (2009).

 When a jury instruction is challenged on appeal, we do not

look at the challenged portion in isolation; rather, we examine

the charge "as a whole to determine its overall effect," and

"whether the challenged language was misleading or ambiguous."

State v. McKinney, 223 N.J. 475, 494 (2015) (citations omitted).

When, as here, there has been no objection, the error must be

 9 A-0482-15T4
"clearly capable of producing an unjust result," R. 2:10-2, to

warrant reversal.

 In the context of jury instructions, plain
 error is "[l]egal impropriety in the charge
 prejudicially affecting the substantial
 rights of the defendant and sufficiently
 grievous to justify notice by the reviewing
 court and to convince the court that of itself
 the error possessed a clear capacity to bring
 about an unjust result."

 [State v. Camacho, 218 N.J. 533, 554 (2014)
 (quoting State v. Adams, 194 N.J. 186, 207
 (2008)).]

 In light of the fact that appropriate instructions were given

to the jury before they began their deliberations and the

compelling evidence of defendant's guilt, the omissions in the

preliminary charge were not clearly capable of producing an unjust

result. R. 2:10-2.

 III.

 Defendant next argues his conviction must be reversed because

Detective Knecht gave impermissible opinion testimony regarding

defendant's state of mind and guilt. We disagree.

 Knecht testified about his role in the investigation and,

during the course of his testimony, read the text messages

exchanged between defendant and "S.D." As we have described,

those messages included statements that S.D. was fourteen-years-

old; that they were meeting to have "fun" at her mother's house;

 10 A-0482-15T4
that "fun" was having sex and defendant's request that "S.D."

prove she intended to do so by sending him a photo of her, naked,

or of her genital area.

 The prosecutor questioned Knecht about the "plan" that

culminated in defendant's arrest in relevant part as follows:

 Q. Okay. You start talking about this, about
 a potential meeting, right. Why don’t
 you explain . . . what your plan is, how
 this is going to be set up and what steps
 you and the other officers take.

 A. Yes, sir. Basically he believes he's
 meeting with a 14 year old girl in a park
 to then go back to her house for the
 purpose of engaging in sexual activity
 based on the text messages.

 Knecht then proceeded to explain why the location was chosen

and where the officers were located to conduct surveillance and

effect the arrest. There was no objection to this testimony.

 The second portion of Knecht's testimony challenged on appeal

relates to questioning about defendant's repeated offers to

"partner up" with the police to assist them in investigating

matters like the one he was charged with. When asked on re-direct

examination if defendant had ever reached out to the police to

report suspicious activity, Knecht said he had never done so.

Defense counsel followed up on this on re-cross-examination,

asking Knecht about defendant's offer to partner up with the

police: "That was a very simple-minded childlike account of a view

 11 A-0482-15T4
of life on his part, don’t you think?" The assistant prosecutor

objected to the question as an effort to ask the detective "to

give an opinion about the defendant's either mental state or

understanding or learning." Defense counsel stated,

 I'm just asking him how he felt. He was the
 one who conducted the interview for two hours
 and spoke with [defendant] for two hours.

 The trial judge overruled the objection and re-cross-

examination continued:

 A. My opinion of [defendant] in that
 interview is that he was articulate. He
 was, you know, he was able to understand
 the questions and come up with some form
 of answer. I believe that partnering –

 Q. Excuse me one minute. My question as
 very specific. Do you believe in your
 opinion in that two hour conversation the
 account about what [the assistant
 prosecutor] calls partnering up with your
 police force was a simple-minded
 childlike account of life?

 A. No, I do not believe that.

 [(Emphasis added).]

 This colloquy was immediately followed by further direct

examination:

 Q. What do you believe when we talk about
 or the defendant talked about this
 partnering up? What do you believe that
 to be?

 12 A-0482-15T4
 A. What I believe that to be was a person
 who was caught committing a crime, failed
 attempt to explain it away.

 [(Emphasis added).]

 There was no objection to this testimony, either.

 It is a well-established principle that a witness, whether

expert or lay, may not offer an opinion as to the defendant's

guilt or state of mind. See, e.g., State v. Sowell, 213 N.J. 89,

103-104 (2013); State v. McLean, 205 N.J. 438, 443, 463 (2011)

(reversing the defendant's possession-with-intent-to-distribute

convictions because a police officer, based on his surveillance

observations of the defendant handing an item to an individual in

exchange for money, gave opinion testimony that a narcotics

transaction had occurred); cf. State v. Cain, 224 N.J. 410, 429

(2016) ("[A]n expert witness may not opine on the defendant's

state of mind.") However, even if improper expert testimony is

elicited, a reversal of defendant's conviction is warranted only

if that testimony was sufficiently prejudicial to have the capacity

to bring about an unjust result. State v. Nesbitt, 185 N.J. 504,

518-19 (2006); State v. Thompson, 405 N.J. Super. 76, 81 (App.

Div. 2009).

 Although both challenged sections of Detective Knecht's

testimony include his opinion of what defendant believed, we find

no grounds for reversal. The first segment of challenged testimony

 13 A-0482-15T4
followed a review of the incriminating statements defendant

admitted making in his text messages. It is certainly true that

the detective should not have prefaced his description of the

police plan with the remark, "Basically he believes he's meeting

with a 14 year old girl . . . ." But the damage from this is

negligible since defendant's admitted statements in the text

messages so strongly support that conclusion and there is no

suggestion that the detective had superior knowledge based on his

employment to decipher the import of those statements.

 Turning to the second challenged segment of testimony, again,

we agree the prosecutor should not have asked the detective what

he believed regarding the defendant's proffers of assistance. The

prosecutor was well aware, based on his own objection, that it was

improper to delve into opinion testimony about defendant's state

of mind.

 But, we must add, this is a case for application of the

invited error doctrine. "Under that settled principle of law,

trial errors that 'were induced, encouraged or acquiesced in or

consented to by defense counsel ordinarily are not a basis for

reversal on appeal. . . .'" State v. A.R., 213 N.J. 542, 561

(2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)

(alteration in original)). "In other words, if a party has

'invited' the error, he is barred from raising an objection for

 14 A-0482-15T4
the first time on appeal." Ibid. (citing N.J. Div. of Youth &

Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010)).

 Defendant explicitly asked Detective Knecht for his opinion

regarding defendant's offer to partner up with the police, asking

him to affirm her characterization that it was a simple-minded,

childlike statement. When the prosecutor objected, she explained

that she was "asking him how he felt" because Knecht "was the one

who conducted the interview for two hours and spoke with

[defendant] for two hours." The trial judge then ruled in her

favor, overruling the objection. The challenged testimony was

elicited immediately thereafter, an error that was plainly

"invited" by defense counsel's successful effort to elicit the

detective's opinion about defendant's state of mind.

 In addition, as we have noted, the evidence of defendant's

guilt, most of which emanated from his own admitted statements,

was compelling. We discern no reason to disturb his conviction.

 Affirmed.

 15 A-0482-15T4