NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2785-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

MARC B. HIGHSMITH,

 Defendant-Appellant.
___________________________________________

 Argued January 26, 2017 – Decided August 21, 2017

 Before Judges Hoffman and O'Connor.

 On appeal from Superior Court of New Jersey,
 Law Division, Mercer County, Indictment No.
 10-09-0978.

 Tamar Y. Lerer, Assistant Deputy Public
 Defender, argued the cause for appellant
 (Joseph E. Krakora, Public Defender,
 attorney; Ms. Lerer, of counsel and on the
 briefs).

 Stephen E. Parrey, Assistant Prosecutor,
 argued the cause for respondent (Angelo J.
 Onofri, Mercer County Prosecutor, attorney;
 Timothy F. Trainor, Special Deputy Attorney
 General/Acting Assistant Prosecutor, of
 counsel and on the brief).

PER CURIAM
 In July 2012, a jury convicted defendant Marc B. Highsmith

of third-degree possession of a controlled dangerous substance

(cocaine), N.J.S.A. 2C:35-10(a)(1); second-degree possession of

a controlled dangerous substance with intent to distribute,

N.J.S.A. 2C:35-5(a)(1); and third-degree possession of a

controlled dangerous substance with intent to distribute on or

near school property, N.J.S.A. 2C:35-7. In April 2014,

defendant was sentenced to an extended term of ten years, with a

three-and-a-half-year period of parole ineligibility.

 Defendant appeals these convictions. For the reasons that

follow, we reverse all of the convictions and remand for a new

trial.

 I

 The only witnesses at trial were two called by the State.

Their pertinent testimony was as follows.

 FBI agent Eric Clark testified that, based upon his

training and experience, he was familiar with the narcotics

trade in Trenton. In 2008, Joseph Baker, Jr., a person

suspected of selling narcotics, was under investigation. A

confidential informant (CI), who had been previously convicted

of a drug offense in federal court, agreed to purchase cocaine

from Baker and, in return, the government agreed to recommend

his sentence be reduced from three to two years.
 2
 A-2785-14T2
 As instructed by the FBI, the CI contacted Baker, who told

the CI to come to his home, located in Trenton. After being

outfitted with a hidden audio and video device and provided with

$3000 in cash, the CI met with his "runner" and together they

drove to Baker's home, although only the CI entered the house.

The runner was unaware the CI was collaborating with the FBI.

Once inside Baker's home, the CI remained in the kitchen until

he left.

 The FBI could hear but could not see what was occurring as

events unfolded, but later viewed the video of the subject

transaction. Clark testified about what he viewed on the video

and proffered opinions interpreting what occurred among those

present in the kitchen. At no time was Clark qualified to

testify as an expert witness.

 Clark noted the CI, Baker, and others were in the kitchen

when the CI first arrived; defendant entered the kitchen soon

thereafter. Clark stated the individuals in the kitchen were

part of the "organization." Defendant objected to and the court

sustained Clark's use of the term "organization." However,

Clark later provided, without objection, his opinion about the

actions of those in the kitchen, an opinion he claimed was based

upon his training and experience:

 3
 A-2785-14T2
 [W]hat was occurring on the video [in the
 kitchen] was obviously illegal and they had
 accessibility to that space. And to have
 accessibility to that space firmly led us to
 believe that they were in on the conspiracy
 because that is not an area that just anyone
 could walk into because the drugs and the
 money were easily available to anyone who
 walked in the kitchen[.] [S]o they have to
 sort of secure that and protect that.
 And, also, in that kind of operation, they
 only want to let trusted people into that
 space for fear that someone might be
 recording them or taping them.

 Thereafter, the court sustained defendant's objection to a

question requesting Clark state how crack cocaine was made;

defendant asserted the question impermissibly requested expert

testimony. However, the court then stated it would permit the

question if Clark acknowledged he had seen and could

specifically state how crack cocaine is made, to which defendant

replied, "I will leave that to the court's discretion."

 Upon testifying he had seen and had been informed by those

in the narcotics trade about how crack cocaine is made, Clark

stated this drug is made by mixing cocaine, water, and baking

soda and heating these ingredients. Clark then added:

 [T]he idea is to take – is to take 100 grams
 of soft cocaine and stretch it to make 100 –
 the approximate number is 140 grams of hard
 cocaine. There is more to sell and it is
 financially profitable for the dealers to
 take the soft and go through this process
 and make it into crack cocaine.

 4
 A-2785-14T2
 After leaving Baker's home, the CI reported back to Clark

and turned over what he had purchased in Baker's home.

Subsequent testing revealed the substance purchased was cocaine

and weighed 124.6 grams, which Clark noted was more than one-

half of an ounce but less than five ounces. Clark also

established there was school property within 1000 feet of

Baker's home.

 The CI also testified. Although the State never endeavored

to and thus the court did not qualify him as an expert witness,

the CI testified about the narcotics trade and the manufacturing

of crack cocaine.1 He noted he had been involved in the drug

trade for over thirteen years and is familiar with how the trade

works, including cooking and selling crack cocaine. He also

opined about the dynamics among those in the kitchen based upon

1
 Although not frequently called as expert witnesses, likely
because their criminal records taint their credibility,
confidential informants or those who have engaged in the
narcotics trade are not foreclosed from being qualified as
expert witnesses merely because they may have a criminal record.
A witness may be qualified as an expert as long as he or she has
"scientific, technical, or other specialized knowledge [that]
will assist the trier of fact to understand the evidence or to
determine a fact in issue[.]" N.J.R.E. 702. A witness may be
qualified on the basis of his or her knowledge, skill,
experience, training, or education. Ibid.; see, e.g., United
States v. Oliver, 468 F. Supp. 2d 980 (C.D. Ill. Jan. 8, 2007),
in which the court qualified a convicted felon as an expert on
crack manufacturing and distribution because of his extensive
experience in cooking and handling crack cocaine. Id. at 984.
 5
 A-2785-14T2
his years of participating in the narcotics trade. Defendant

did not object to the CI's testimony.

 When the CI first arrived in the kitchen, he explained

Baker was crushing cocaine that was in rock form into powder, in

preparation for the cocaine to be cooked into crack. The CI

explained that after cocaine powder is crushed, it is mixed with

baking soda and water, and then heated on the stove. A man by

the name of "Los" then entered the kitchen, who put money on the

table and started crushing the cocaine as well. The CI

testified the money came from the sale of drugs, and indicated

placing the cash on the table was Los' way of transferring the

cash to Baker.

 Defendant then entered the kitchen with a box of baking

soda, but Baker did not use any of that baking soda to cook the

cocaine he was preparing on the stove. The CI pointed out

defendant mentioned to those in the kitchen that he had just

sold twenty-five bags of crack cocaine in less than ten minutes.

 After heating the cocaine long enough to transform it into

crack cocaine, Baker dried it with paper towels, weighed and

placed it in a baggy, and transferred the baggy to a runner.

The runner gave the baggy to the CI after he left Baker's house;

in return for the runner's services, she received enough of the

crack cocaine that had been prepared for her to get high.
 6
 A-2785-14T2
Before leaving Baker's house, the CI paid Baker the cash

provided to him by the FBI.

 The CI testified Baker and the others in the kitchen,

including defendant, were all part of "the drug crew, the drug

gang." In a crew are a runner, "workers," and the head of the

crew or "boss man." Baker was the "boss man" for this

particular crew. The role of a crew is to distribute drugs.

 The CI further stated each member of the crew in the

kitchen benefitted from the sale of the crack cocaine to the CI,

specifically, each would get a share of the profits. When asked

how he knew that was in fact the arrangement among those in the

kitchen, the CI replied, "Because I been in gangs for a long

time." The CI also noted that only crew members are allowed in

an area where cocaine is being cooked, because "That's the way

it works. . . . I've been doing it for so long, I know."

 In its summation, the State drew heavily from Clark's and

the CI's testimony in support of its argument defendant

distributed the subject drugs to the CI, noting such witnesses

established how crack cocaine is made, that defendant was part

of the crew that distributed drugs to the CI, and, as a member

of the crew, he benefitted from the sale of those drugs.

 II

 7
 A-2785-14T2
 On appeal, defendant asserts the following for our

consideration:

 POINT I – THE WITNESSES' TESTIMONY IN THIS
 CASE OVERSTEPPED THE BOUNDARIES OF
 ACCEPTABLE LAY OPINION TESTIMONY, CONTRARY
 TO STATE V. MCLEAN.

 In his brief, defendant elaborates the witnesses provided

expert testimony without first being qualified as experts and,

thus, should not have been permitted to testify about the

structure of any drug-dealing organization, let alone that

defendant's mere presence in the kitchen made him a member of

Baker's drug distribution ring, from which he derived a benefit

when there was a drug sale. Defendant argues such testimony

suggested defendant possessed the crack cocaine in the kitchen

with the intent to distribute it to the CI. It was defendant's

position he was not involved in the sale of the drugs to the CI.

 Defendant further complains the jury was not provided with

the expert witness charge to place these witnesses' testimony

into proper context. See Model Jury Charge (Criminal), "Expert

Testimony" (2003) (requiring the court to identify to the jury

each testifying expert and such expert's area of expertise).

Finally, defendant contends Clark inappropriately testified as

to the ultimate issue when he stated what occurred in the

kitchen was "obviously illegal."

 8
 A-2785-14T2
 Defendant maintains any one of these three errors warrants

a reversal of his convictions and a remand for a new trial. We

agree the testimony about which defendant complains exceeded

what is permissible for fact witnesses, in violation of State v.

McLean, 205 N.J. 438 (2011).

 Lay opinion testimony is governed by N.J.R.E. 701, which

permits lay witness "testimony in the form of opinions or

inferences . . . if it (a) is rationally based on the perception

of the witness and (b) will assist in understanding the witness'

testimony or in determining a fact in issue."

 In contrast, an expert witness may testify in the form of

an opinion provided it "will assist the trier of fact to

understand the evidence or to determine a fact in issue."

N.J.R.E. 702. To be admissible, expert testimony must be about

a subject that is beyond the understanding of the average person

of ordinary experience, education, and knowledge. State v.

Sowell, 213 N.J. 89, 99 (2013).

 Our Supreme Court recently commented upon the scope of drug

expert testimony in criminal cases. See State v. Cain, 224 N.J.

410, 426-27 (2016). The Court noted, "[t]he average juror is

not knowledgeable about the arcana of drug-distribution

schemes." Id. at 426. Thus, experts may testify about how drug

traffickers package and process drugs for distribution; the
 9
 A-2785-14T2
quantities and concentration of drugs; the value of drugs; and

the function of drug paraphernalia. Ibid. "Experts may also

provide insight into the roles played by individuals in street-

level drug transactions, and into the various machinations used

by drug dealers to thwart detection." Ibid. (citation omitted)

(citing State v. Nesbitt, 185 N.J. 504, 515 (2016); State v.

Berry, 140 N.J. 280, 301-02 (1995)).

 The McLean Court also noted that, if properly qualified as

an expert, "an expert may explain the roles played by multiple

defendants in a drug distribution scheme and may offer an

opinion about the implications of the behavior that was observed

by the fact witness." McLean, supra, 205 N.J. at 460-61. On

the importance a witness giving expert testimony be qualified as

an expert, the Court has noted "testimony coming from a law

enforcement officer claiming to have superior knowledge and

experience likely will have a profound influence on the

deliberations of the jury." Cain, supra, 224 N.J. at 427.

 In addition, drug experts "should not express an opinion on

matters that fall within the ken of the average juror or offer

an opinion about the defendant's guilt." Ibid. (citing Nesbitt,

supra, 185 N.J. at 512-14). Thus, "in drug cases, an expert

witness may not opine on the defendant's state of mind. Whether

a defendant possessed a controlled dangerous substance with the
 10
 A-2785-14T2
intent to distribute is an ultimate issue of fact to be decided

by the jury."2 Id. at 429. In that regard, the Court has

explained:

 We have come to the conclusion that an
 expert is no better qualified than a juror
 to determine the defendant's state of mind
 after the expert has given testimony on the
 peculiar characteristics of drug
 distribution that are beyond the juror's
 common understanding. In drug cases, such
 ultimate-issue testimony may be viewed as an
 expert's quasi-pronouncement of guilt that
 intrudes on the exclusive domain of the jury
 as factfinder and may result in
 impermissible bolstering of fact witnesses.
 The prejudice and potential confusion caused
 by such testimony substantially outweighs
 any probative value it may possess.

 [Id. at 427-28.]

 Here, because defendant did not object to the testimony

about which he complains, we review the claimed error under the

plain error standard, whether the error was clearly capable of

producing an unjust result. R. 2:10-2; State v. Maloney, 216

N.J. 91, 104 (2013). "Reversal of defendant's conviction is

required only if there was an error 'sufficient to raise a

reasonable doubt as to whether [it] led the jury to a result it

otherwise would not have reached.'" State v. Atwater, 400 N.J.

Super. 319, 336 (App. Div. 2008) (quoting State v. Daniels, 182

2
 Cain was decided while this matter was on appeal, and we have
determined Cain has pipeline retroactivity. State v. Green, 447
N.J. Super. 317, 328 (App. Div. 2016).
 11
 A-2785-14T2
N.J. 80, 95 (2004)). Hence, a defendant need not demonstrate

that but for the error the jury would have reached a contrary

result. He must only show that the error raises a reasonable

doubt that the jury was led to a result it otherwise might not

have reached. We are satisfied such an error occurred.

 First, neither Clark nor the CI were qualified by the court

to testify as experts, yet both provided expert opinions; that

is, they expressed opinions on topics outside the ken of the

average person of ordinary experience, education, and knowledge.

Both may well have been permitted to provide expert opinions

because of their experience in the world of narcotics sales had

the State offered them as experts and the court reviewed their

qualifications, but that never occurred. Thus, neither was

permitted to render any expert opinions.

 The CI expressed the expert opinion that those in the

kitchen were all part of a "drug crew," whose goal was to

distribute drugs, and each person in the kitchen was going to

benefit from the sale of the crack cocaine to the CI. His

opinion was not derived from his experience with this particular

crew but from his lengthy experience in the drug trade in

general. He also noted only those on the crew were permitted in

 12
 A-2785-14T2
the kitchen, the specific area where the crack-cocaine was being

made.3

 While there was evidence defendant had engaged in the sale

of drugs, there was no evidence – apart from the witnesses'

testimony – that he was involved in the sale of the drugs to the

CI. To show defendant was involved in this sale, the State

argues the baking soda defendant had in his hand when he entered

the kitchen was used to make the alleged crack cocaine sold to

the CI, but the record does not support this claim.

 Clark voiced an opinion consistent with the CI's. Clark

stated only those in the kitchen were permitted "in that space"

because they were "in on the conspiracy," indicating defendant's

presence alone in the kitchen made him a part of the scheme to

distribute drugs to the CI. In addition, Clark opined what

occurred in the kitchen was "obviously illegal," providing an

opinion on the ultimate issue, clarified in Cain as forbidden.

See Cain, supra, 224 N.J. at 429. Whether or not defendant

committed any of the charged offenses was a decision to be made

by only the jury.

3
 There was evidence that at one point Baker's mother and her
boyfriend came into the kitchen. The CI explained the mother
contributed to the operation because she in fact owned the home
and was permitting Baker to use her kitchen. The CI noted that
in return, it was very likely she and her boyfriend received
some of the drug Baker cooked on the stove, if only just enough
to get high.
 13
 A-2785-14T2
 The witnesses' testimony was clearly capable of raising a

reasonable doubt the jury was led to a result it otherwise might

not have reached. Constructive possession (there was no

evidence defendant had been in actual possession of the subject

drugs) of an item may be found when "the circumstances permit a

reasonable inference that [the defendant] has knowledge of its

presence, and intends and has the capacity to exercise physical

control or dominion over it during a span of time." State v.

Spivey, 179 N.J. 229, 237 (2004).

 While the circumstances permitted a reasonable inference

defendant had knowledge of the presence of the drugs to be sold

to the CI and that defendant had the capacity to exercise

physical control over such drugs, there was no evidence he

intended to exercise physical control or dominion over the drugs

apart from the witnesses' testimony. Their testimony suggested

defendant's mere presence in the kitchen made him a part owner

of the drugs to be sold to the CI, and thus defendant exercised

dominion over them. As for the distribution charge, the

witnesses' testimony similarly provided evidence defendant's

presence in the kitchen meant he was a part owner of the drugs

and was included in Baker's and Los' efforts to prepare and sell

those drugs to the CI.

 14
 A-2785-14T2
 It is eminently conceivable the jury could have been swayed

by the witnesses' opinions, thereby prejudicing defendant.

McLean, supra, 205 N.J. at 452 (noting that when a lay witness

"crosses the line of permissibility[,] [this] contaminates all

related proofs with prejudicial qualities not easily cured."

(quoting State v. Singleton, 326 N.J. Super. 351, 354 (App. Div.

1999))). Given their testimony, we lack confidence in the

integrity of defendant's guilty verdict. This is not a matter

where the evidence of defendant's guilt was overwhelming. Cf.

Sowell, supra, 213 N.J. at 107 (improper testimony of the

State's drug expert was considered harmless error due to the

defendant's admission, video of the transaction, and the

arresting officer's observations of the transactions and

discovery of drugs on the defendant). Consequently, we conclude

the prejudicial testimony raises a reasonable doubt the jury was

led to a result it otherwise might not have reached.

Accordingly, defendant's convictions must be reversed and the

matter remanded for a new trial.

 Because of our disposition, we need not reach the remaining

argument, specifically, whether the court erred by failing to

provide the charge concerning how the jury is to consider an

expert's testimony. However, we note for the benefit of the

trial court that in all cases where expert testimony is allowed,
 15
 A-2785-14T2
the court should give a limiting instruction to the jury "that

conveys to the jury its absolute prerogative to reject both the

expert's opinion and the version of the facts consistent with

that opinion." Berry, supra, 140 N.J. at 304.

 Reversed and remanded for a new trial.

 16
 A-2785-14T2