**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2872-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KESHAWN TUCKER, a/k/a
KESAHWN TUCKER

    Defendant-Appellant.

_____

Submitted February 8, 2021 – Decided March 16, 2021

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-03-0700.

Joseph E. Krakora, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Caroline C. Galda, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried by a jury along with a codefendant, defendant Keshawn Taylor was found guilty of several criminal offenses arising from his possession and handling of heroin, a controlled dangerous substance ("CDS"). Specifically, defendant was convicted of count nine, third-degree possession of a CDS, N.J.S.A. 2C:35-10(a); count ten, third-degree possession with intent to distribute CDS, N.J.S.A. 2C:35-5(a)(1); and count twelve, second-degree possession with intent to distribute CDS within 500 feet of public property, N.J.S.A. 2C:35-7.1(a).

The operative events, which took place in and near the courtyard of the Riverside Villa public housing complex in Newark, substantially were filmed by a security camera. The video depicts defendant, who was wearing a red jacket, and other persons exchanging what appear to be packets of heroin and money.

After the public housing authority's safety and security director, Hector A. Rodriguez, watched the live footage, he alerted police officers and they arrested defendant at the scene. The police confiscated from defendant's waist area a plastic bag containing thirty-four glassine bags of heroin. The incriminating video, running about eight minutes, was played for the jury at trial as part of the State's case in chief.

The trial court sentenced defendant, who has a substantial criminal record, to a nine-year prison term. The court specified the sentence is subject to a four-and-a-half-year period of parole ineligibility.

On appeal, defendant presents these arguments for our consideration challenging his conviction and sentence:

> POINT I
>
> IT WAS REVERSIBLE ERROR FOR THE HOUSING AUTHORITY WITNESS TO CLAIM EXPERTISE IN DRUG TRANSACTIONS AND TESTIFY THAT DEFENDANTS WERE SELLING DRUGS, WHICH WAS THE ULTIMATE ISSUE IN THE CASE. THE WITNESS'S REPEATED ASSERTIONS THAT DEFENDANTS WERE GUILTY OF SELLING DRUGS SO DOMINATED THE TRIAL THAT THE COURT'S BELATED ATTEMPT AT A CURATIVE INSTRUCTION COULD NOT SALVAGE THE ERROR.
>
> A. THE SAFETY DIRECTOR WAS NOT PROFFERED OR QUALIFIED AS AN EXPERT IN DRUG TRANSACTIONS, AND WAS IMPROPERLY ALLOWED TO OFFER EXPERT TESTIMONY THAT DEFENDANTS WERE SELLING DRUGS.
>
> B. THE SAFETY DIRECTOR'S OPINION THAT DEFENDANTS WERE SELLING DRUGS WAS INADMISSIBLE BECAUSE IT WAS UNNECESSARY.
>
> C. THE SAFETY DIRECTOR'S OPINION THAT DEFENDANTS WERE SELLING DRUGS WAS

3

INADMISSIBLE BECAUSE IT INTRUDED ON THE PROVINCE OF THE JURY.

D.  THE BELATED INSTRUCTION FAILED TO CURE THE OVERWHELMING PREJUDICE CAUSED BY THE REPEATED AND INADMISSIBLE OPINION TESTIMONY.

POINT II

THE IMPOSITION OF THE MAXIMUM DISCRETIONARY PAROLE DISQUALIFIER IS EXCESSIVE.

Having fully considered these points, we affirm both defendant's conviction and sentence.

I.

We first consider defendant's arguments concerning the propriety of the testimony of Rodriguez, the Director of Safety and Security.  In particular, defendant contends the prosecution violated N.J.R.E. 701 by presenting lay opinion testimony from Rodriguez, in which he described activities on the video for the jury, essentially, as it watched the footage.

The State concedes that portions of Rodriguez's testimony narrating the video exceeded the limitations of Rule 701 and case law, but it argues such error in admitting the testimony was rectified by the trial judge's subsequent limiting instruction.  Further, the State maintains that, given the contents of the video

A-2872-18

itself that clearly evidence defendant's illegal drug dealing, the error in admitting the security officer's lay opinion was harmless. We agree with the State's position.

The Video Footage

The security camera footage[1] provided by the Housing Authority is approximately eight minutes and nineteen seconds long. The video begins with three men standing together, one in a red jacket with black pants, one with a black jacket and a third with a two-tone grey and blue jacket. At approximately the forty-five second mark, a group of separate individuals pass by the three men. As they pass by, the man in the red jacket and the man in the black jacket break away to follow the passersby.

The camera pans to follow the individuals. At about the fifty-nine second mark the man in the red jacket can be seen touching hands with another individual in a dark colored jacket. The men point to a certain area, and the man in the red jacket walks down the pathway past a gate to a third man. Then, a man in a white hat follows, reaching toward his ankle when he stops. The

---

[1] We have been supplied with a copy of the video, which was marked and admitted as a trial exhibit. We have reviewed the video, mindful of our limited role in reviewing such digital evidence presented in the trial court. See State v. S.S., 229 N.J. 360, 364-65 (2017).

camera zooms in on the individuals. The man in red and the man in the white hat then appear to make an exchange. One of the exchanged items reasonably appears to be money.

Again, at about the one minute and fifty-four second mark, another exchange occurs. This time the man in the red jacket pulls out what appears to be a plastic bag, reaches into it, and makes an exchange with a man in a black hat and black jacket. The camera zooms in on the man in the red jacket's hands, and the man in the black hat can be seen counting money. During this frame, multiple people walk in and out of view and a third person appears to add something to the exchange. As the apparent purchaser walks away, the camera follows him and zooms in on his hands, where he can be seen counting something that appears red and white.

For the next few minutes of the video, the camera follows the man in red as he stands by. He speaks with two other men, who were occasionally counting money, on their phones and smoking cigarettes. During that entire time, some passersby walk through the frame, including school children with backpacks.

At approximately the seven minute and fifty second mark, a police officer with a marked vest quickly approaches on screen and grabs the man in the red jacket and a second individual. They immediately lower themselves to the

ground, face down, and the camera pans to other areas where more police officers can be seen rounding up various individuals. As the video ends, the man in red is just being pulled to his feet from the ground.

Rodriguez's Testimony

As we have already noted, the prosecution called Rodriguez as a witness to provide context for the video and how it resulted in defendant's on-the-spot apprehension. He described his duties as the Director of Safety and Security, spanning about three and a half years, as well as his over nineteen years of experience as a police officer. This experience included police tasks ranging from "regular traffic stops to narcotics arrests, gun arrests and also [as] part of the Newark SWAT team." Rodriguez also stated he knew multiple officers involved in the present drug bust, and on cross-examination noted that his experience included work on the "Narcotics Task Force."

Rodriguez shared his recollections concerning the day of defendant's arrest. That morning, he was watching security footage from multiple locations on "big screens," with a focus on "the highest complaint locations" one of them "obviously, is Riverside Villa." He further described that in watching the live streaming footage of Riverside Villa, he saw children walking to school and "observed what appeared to be numerous drug transactions." Defense counsel

objected to this declaration on the basis that Rodriguez was not testifying as an expert, announcing that "once the video is playing, I'm going to object to any narration of the video." The court overruled the objection as "not ripe."

Rodriguez testified that "[b]ecause the exchange of money with items that were given and from prior - - my experience. It was clearly that it was drug transactions that was occurring [on the video]." He further described what the individuals on the screen were wearing and that he continued to monitor the footage to "gather as much evidence as possible" because "it was numerous transactions done, at which point . . . , I notified the Newark Police Department."

Rodriguez explained that the live footage was saved to a large storage drive, where it could be accessed. He accessed the footage on "that same exact day" to give the relevant footage, as well as some still-frame pictures, to Newark Police. The prosecutor then showed him multiple still images of individuals depicted in the security camera footage. The still images were entered into evidence without objection.

The State moved the video into evidence and, in doing so, asked Rodriguez to testify as to how it was created. He explained that:

> [O]nce I observed the drug transactions and what was taking place and given all the descriptions and things of that nature, we went back and we just went back from the beginning of the time that we started observing it

'til a few minutes later 'til Lieutenant Whitaker and them did the takedown.

Rodriguez further stated that, "because of my experience in law enforcement, I was able to determine what was being done." The State then played the video, in its entirety, for the jury with no audio.

After the security footage playback ended, the prosecutor asked Rodriguez what the still frames from certain photographs depicted. In response, he stated: "The gentleman in the red jacket - - red coat has the drugs on him, the gentleman in the black coat has the money on him, and their transaction." He provided similar testimony corresponding to other still frames extracted from the video.

Rodriguez was cross-examined extensively by counsel for defendant and for the co-defendant. During cross-examination, Rodriguez reiterated that he believed he witnessed "drug activity," and that his decision to only pull the selected timeframe of video was based on what he believed would be "helpful," but he could have pulled more if he had been asked. He explained that within "seconds" after the "takedown was done, [the video] was saved immediately."

When counsel for defendant asked Rodriguez, based on his experience as a detective, whether he was "familiar with the concept of preservation of evidence" and "completeness of evidence," the State objected on scope of cross-examination grounds. At sidebar on the issue, the issue was discussed that

9

defense counsel was attempting to elicit testimony on why he ended the video prior to the completion of the arrest, and <u>counsel for co-defendant</u> stated:

> I would just like to add one thing to that. If - - if he - - I believe it's appropriate to ask him things that a police officer would know if he's allowed to use his background as a police officer to testify as to whether or not he thinks something is a narcotic transaction.

The judge sustained the objection on the grounds that the question had already been asked and answered and because he was no longer a police officer.

Defendant's counsel continued, and asked if, in his experience as a detective, he knew whether there would be a search incident to arrest for suspected drug violations. This too was objected to by the State, and defendant's counsel explained that he was "trying to show that he [(Rodriguez)] cut off the tape knowing that it would exclude important evidence as a detective." The objection was sustained.

Defendant's counsel further asked Rodriguez if he was familiar with the term "blue wall," which sparked another objection by the State on whether counsel could use the line of questioning to establish bias favoring the police. The objection was overruled, and that line of questioning allowed to continue.

On re-direct examination, defendant's counsel objected to further explanatory testimony from Rodriguez because "[h]e's already admitted he

10

didn't know they were drugs and he's not an expert in whether these were drugs or not."  In overruling that objection, the trial judge stated the following at sidebar:

> [I]n other words, [Rodriguez] didn't know they were drugs.  He testified, based upon his observations, his experience, that what he believed he was tracking were drug transactions.  And there appear to be a few drug transactions on there.  I don't see what the objection is to his answer.  I'd like a legal foundation.
>
> [(Emphasis added).]

The re-direct examination of Rodriguez continued.  Defense counsel conducted a short re-cross examination, reiterating issues previously brought up about potential bias and whether Rodriguez actually knew that drugs were being exchanged for money.

Later in the trial, defendant's counsel made a "belated objection" to Rodriguez's testimony, which he characterized as "highly objectionable." Outside the presence of the jury, the State and defense counsel argued over whether Rodriguez, as a Housing Authority employee, could properly testify to whether what he witnessed was a "drug transaction" even considering his prior experience as a law enforcement officer.  The judge noted that such an objection already had been made at the time of Rodriguez's testimony.  The judge added:

[T]he case that you're citing is different because the evidence that was being presented was <u>solely based upon what the officer saw himself</u>. [By contrast,] [t]he testimony that was elicited [here] both on direct and cross <u>used the actual video in this case</u> where he was being question[ed] as to what he observed, why he did certain things, why he stopped the camera where he stopped it, he was focusing in and out, he was going to different corners. So his testimony then got a lot more specific about why he did certain things. So his testimony is certainly critical. It was necessary. It was relevant. It was pertinent. <u>With regard to any opinion that may have been rendered his opinion when he was pressed on testimony indicated he took certain actions because of what he saw or what he believed he saw</u>. So as far as it being testimony as to why the ultimate steps were taken to call the police based upon what he saw that was part of his employment, that's what he was called upon to do. I certainly think that its relevant, allowable, not objectionable. <u>As to an ultimate opinion as to whether these individuals were involved in hand to hand transactions that's for them to decide based upon the video</u>. <u>So if you would like for me to give a curative instruction about any ultimate opinion as to what occurred on the tape I'll be happy to do so as part of our final charge</u>. <u>That they should disregard the ultimate opinion</u>. Ultimate opinion is for the jurors to decide. Something to that effect if your - - <u>you have plenty of time to craft it</u>. And we're going to discuss our jury charge shortly.

[(Emphasis added).]

Shortly after this ruling, the defense moved for a judgment of acquittal based on the fact that there was not conclusive proof that the items seized were,

in fact, heroin because they had not been tested.[2] That motion was denied. The judge noted that the motion focused only on the minimal number of items that were retrieved but not tested, but the majority of the items had been tested and were narcotics based upon a narcotics expert's testimony.

Closing Arguments and The Court's Limiting Instruction

During summations, counsel for both defendants made extensive arguments attempting to discredit the testimony of Rodriguez as biased and ill informed. The State countered that Rodriguez's testimony was credible and reliable.

In addition to the standard jury charge on witness credibility (see Model Jury Charges (Criminal), "General Final Charge (General Information to Credibility of Witnesses) (rev. May 12, 2014)), the judge then gave the jurors the following limiting instruction concerning Rodriguez's testimony:

> During the course of the trial you heard testimony from Newark Housing Authority Security Advisor Hector Rodriguez as to his role in this matter. While the witness may have had –- while this witness may have had occasion to render his opinion as to whether any drug transaction occurred, any such opinion must be disregarded by you and should not be considered by you in any manner in reaching your ultimate determination as to whether any defendant is guilty of

---

[2] The State noted that one of the detectives testified he did a "field test" on a number of the items indicating they were contraband.

an offense charged. <u>The ultimate determination</u> of whether or not the State has proven a defendant's guilt beyond a reasonable doubt <u>is to be made only by the juror[s]</u>.

[(Emphasis added).]

Notably, the court did not identify Rodriguez as an expert during its separate charge concerning expert witnesses.

<u>Application of N.J.R.E. 701 and Case Law</u>

On appeal, defendant maintains he was substantially prejudiced by the improper admission of the lay opinions of Rodriguez, including the security officer's assertion that he observed "a drug transaction" on the security footage. Defendant argues such testimony violates recent case law limiting the State's presentation of lay opinion from a police officer, particularly <u>State v. McLean,</u> 205 N.J. 438 (2011) and <u>State v. Simms</u>, 224 N.J. 393 (2016).

In <u>McLean</u>, the Supreme Court announced certain restrictions upon the ability of prosecutors to present lay opinion testimony from police officers who have not been proffered by the State as expert witnesses. <u>Id.</u> at 460-63. The Court specifically considered in <u>McLean</u> testimony given by a police officer who had participated in an investigation that led to the defendant's prosecution for possession of CDS and possession of CDS with intent to distribute. <u>Id.</u> at 443-47. The officer testified that he had observed the defendant engage in two

transactions, in both instances some unidentified item had been exchanged for money. Id. at 443-44. Over defense counsel's objection, the prosecutor asked the officer, "[s]o based on your own experience sir, and your own training, what did you believe happened at that time?" Id. at 446. The trial court permitted the officer, who had not been qualified as an expert witness, to testify that, based on his experience, he believed he had observed a drug transaction. Ibid.

The Court held in McLean that the police officer's statement was inadmissible as a lay opinion, because it was an expression of a belief in the defendant's guilt and because it offered an opinion on matters that were not beyond the understanding of the jury. Id. at 463; see also N.J.R.E. 701. The Court ruled that an officer testifying as such a lay or fact witness may not testify about his belief that a transaction he observed was a narcotics sale. Id. at 461. "To permit the lay opinion rule to operate in that fashion would be to authorize every arresting officer to opine on guilt in every case." Ibid.

The Court further noted in McLean that admissible fact testimony by a police officer cannot express what the officer "believed," "thought," or "suspected." Ibid. Only if a police officer is properly qualified as an expert witness may he or she give testimony explaining the implications of observed

A-2872-18

behaviors that may be beyond the understanding of an average juror. Id. at 460-61; see also N.J.R.E. 702.

As another key aspect of its analysis, the Court concluded in McLean that the references to the lay witness police officer's "training and experience, coupled with the request that he testify about his belief as to what had happened, impermissibly asked for an expert opinion from a witness who had not been qualified to give one." Id. at 462. Because of that harmful error, the Court reversed McLean's convictions of the intent-to-distribute offenses, but it left intact his conviction of two possessory offenses. Id. at 463.

The Supreme Court further clarified these principles in Simms, 224 N.J. 393, vacating a defendant's convictions and remanding for a new trial. Id. at 409. There a police detective conducting drug surveillance watched as two cars converged head on. According to the detective, defendant exited one car, approached the second, leaned into the passenger window and handed "an object" to the other individual in exchange for what he believed to be "one bill of currency." Id. at 397-98. The detective called upon other officers to move in for a bust because he believed a "C.D.S. transaction was taking place." Id. at 402. When officers approached both vehicles, they found evidence consistent

with the crime, including heroin on both persons with matching logos and cash. Id. at 398.

At trial in Simms the prosecution called an expert witness on the issue of narcotics trafficking. In doing so, they posed a hypothetical question that tracked the facts of the case. At the end of that hypothetical, the expert was asked: "Based on the facts that I have given you, are you able to form an opinion as to whether the 13 bags the female possessed, are you able to form an opinion as to whether the female possessed those 13 bags for personal use or distribution[?]" Id. at 399. To which the expert responded: Based on the facts that you've given me, that's consistent with the distribution. Based on those facts, . . . it appears consistent that the female may have conspired with the male or conspired with the male to distribute C.D.S. That would be my opinion on it." Id. at 399-400. There was no objection from defense counsel, no video or other corroborating evidence was provided, and no apparent curative instruction on the issue.

The Supreme Court reiterated in Simms these guiding principles:

> From our evidence rules, we have established guiding principles to ensure the proper use of opinion testimony in drug cases. Expert testimony is not necessary to tell the jury the "obvious" or to resolve issues that the jury can figure out on its own. [Nesbitt, 185 N.J. at 514]. In other words, "[e]xpert testimony should be limited to

17

areas that are beyond the understanding of the jury." State v. Sowell, 213 N.J. 89, 102 (2013). A prosecutor may not "summarize straightforward but disputed evidence in the form of a hypothetical and then elicit an expert opinion about what happened." Ibid. Such an "approach improperly bolsters the State's proofs with expert testimony and can usurp the jury's sole responsibility to find the facts." Ibid.

[Id. at 403 (emphasis added).]

The Court further noted in Simms that the prosecution violated McLean by presenting the testimony of an arresting officer, who related to the jury that the detective radioed that he was "possibly observing a C.D.S. transaction." 224 N.J. at 404. However, the Court declined to reach the issue of whether that particular testimony constituted plain error, because the State's use of the hypothetical was a "more serious error[]" that "plagued this trial." Ibid.

Here, as we have already noted, the State acknowledges that the prosecution erred in presenting to the jury testimony from Rodriguez essentially narrating the surveillance video and giving his lay opinion that the activities on the footage appeared to be one or more drug transactions. Yet this admitted error does not automatically mandate reversal of defendant's conviction and a new trial.

Defendant has the burden of showing that this evidential error was "clearly capable of producing an unjust result." R. 2:10-2. We conclude he has not met

that burden. To the contrary, we concur with the State that the error, while unfortunate, was harmless in light of the strength of the State's other proofs, particularly the incriminating video itself.

The application of harmless error principles to a McLean violation is illustrated by the Supreme Court's very recent January 21, 2021 opinion in State v. Singh, __ N.J. __ (2021). In that case, all seven justices determined that a police officer's narration of a surveillance video was improperly presented to jurors. However, the justices differed on whether that narration amounted to plain or reversible error, the majority finding that it did not. Slip op. at 4, 13. The majority consequently affirmed that defendant's conviction.

Specifically in Singh, the Court considered "whether it was plain error for the trial court to allow the detective to make two references to 'the defendant' in narrating the surveillance footage of a robbery for the jury" under N.J.R.E. 701. Slip op. at 3. There, a gas station attendant testified that a man entered the store wielding a machete, with his face and hands completely covered, and robbed the store of its money. After the incident was reported, police officers noticed an individual in clothes similar to those described by the victim, about a quarter mile from the gas station. Upon seeing the police, the suspect turned and ran. One officer caught a brief glimpse of his face, "maybe a second, half a second."

Slip op. at 4.  The officers pursued him on foot but radioed they "[l]ost sight of a black male wearing a black hoodie." Ibid.

Soon after, the police apprehended the defendant, leaning against the house in dark clothing, sweating and breathing heavily.  Ibid.  A black sweatshirt was nearby. When ordered to get on the ground, the defendant responded that he was "just trying to score some drugs" and refused to comply until he was wrestled to the ground.  Ibid.  The defendant had no weapons on him.  However, in the same backyard where he was arrested, police found a sweatshirt, a "Hello Kitty" cap, a machete, a plastic bag with the robbery proceeds, and a wallet with CDS in it.  Ibid.

At trial in Singh, the victim and one of the arresting detectives narrated for the jurors the gas station surveillance footage.  During that narration, the detective noted that the shoes worn by the "suspect" in the video were similar to the shoes removed from the defendant after his arrest.  In addition, he stated that: "[u]m, we found one glove on him. And he was wearing gloves in the video, the video that we saw here."  Slip op. at 6.  The same detective referenced the suspect in the video as "defendant" twice during his narration.  Slip op. at 7-8, 11.  In addition, another arresting officer, who had seen the suspect's face for "maybe a second," testified and "explicitly identified defendant as the suspect

whom he initially chased and observed dropping the machete and plastic bag full of cash." Slip op. at 6.

The Court's majority opinion in Singh held that the testimony of the detective about the similarity between the defendant's shoes and the shoes worn by the suspect in the video were proper lay opinion testimony under N.J.R.E. 701. Slip op. at 10. The majority further determined that the detective's fleeting references to the suspect as "defendant" were harmless error. Ibid.

The Court majority in Singh cited State v. LaBrutto, 114 N.J. 187 (1989). In LaBrutto, an investigating officer's opinion, derived from his investigation, about a car's point of impact and which factors may have led to the accident was admitted into evidence under a predecessor to N.J.R.E. 701. The Court explained that in LaBrutto, the officer's opinion was rationally based on his observations at the scene, and helpful to the jury. The Court rejected the proposition that the officer's testimony invaded the province of the jury, because the average juror could determine such information from the officer's description of physical evidence. Slip op. at 10 (quoting LaBrutto, 114 N.J. at 199-202).

The Court's majority in Singh reasoned that the passing references to "defendant" in the video, among the multiple other nouns used to describe the

suspect in the footage, were erroneous but not capable of producing an unjust result. Slip op. at 11. Other circumstantial evidence, such as the defendant's sweaty "physical state" and his proximity to other evidence when found close by the crime scene, rendered the opinion references harmless. Slip op. at 11.

With regard to the officer's comments about defendant's shoes and the shoes on the suspect in the footage, the majority in Singh reasoned the testimony satisfied N.J.R.E. 701 for two reasons: (1) the detective had first-hand knowledge of what the sneakers looked like from being on the scene; (2) because of his first-hand knowledge, his testimony was helpful to the jury and "never stated that the sneakers in the surveillance footage were the [defendant's] sneakers." Slip op. at 11-12. The Court majority noted the jurors were free to discredit the testimony if they did not agree.

Three dissenting justices in Singh stated that the defendant's conviction should be reversed. They noted an objection had been made by trial counsel regarding the detectives testifying about the surveillance and specifically to the comments about the shoes, even if not specifically about the "defendant" comment. Slip op. at 15-16. The dissent concluded the testimony in Singh was so unduly prejudicial that a reversal was required.

22

In the present case, we conclude, as did the <u>Singh</u> majority, that the improper admission of lay opinion narrating and characterizing the events on a surveillance video does not require automatic reversal of the conviction. The error, while conceded, was harmless. We reach that conclusion for two primary reasons.

First, the surveillance video itself graphically depicts defendant's participation in hand-to-hand drug dealing. He was immediately arrested, and numerous packets of heroin were found on his person. When apprehended, defendant incriminated himself by telling the police, "You got me, I'm just trying to make some money."[3] Bluntly stated, defendant was caught red-handed. Given those proofs, the superfluous commentary of Rodriguez could not have reasonably made a material difference in the juror's direct assessment of guilt. <u>See</u> <u>State v. Sowell</u>, 224 N.J. 89, 94 (2013) (declining to reverse a conviction, despite the erroneous admission of lay opinion, where there was overwhelming evidence of the defendant's guilt, which included his admission of wrongdoing and a videotape of the narcotics exchange).

---

[3] Defendant has not appealed the trial court's pretrial decision denying his motion to suppress this statement.

Second, as we have pointed out, the trial court issued a cautionary instruction to the jurors advising the jurors to not be guided by Rodriguez's lay opinion. We presume the jurors obeyed that limiting instruction. State v. Ross, 218 N.J. 130, 152 (2014). The situation is not comparable to that in State v. Herbert, 457 N.J. Super. 490, 494-95 (App. Div. 2019), in which we ruled a jury instruction to ignore testimony about a defendant's gang membership was inadequate to overcome the prejudice from such an inflammatory disclosure. There was no gang revelation here, nor any equivalent inflammatory reference that could arouse juror passions.

In sum, the lay opinion testimony here was admitted in error, but does not translate into reversible harmful error.

II.

Little needs to be said about defendant's challenge to his sentence. Defendant argues that his sentence applying the maximum allowable mandatory-minimum term is excessive and unwarranted for this offense. He contends that by applying the maximum parole disqualifier under N.J.S.A. 2C:43-6(b) the trial judge erroneously took into account only aggravating factors that were defendant-specific, rather than those that aggravated the offense itself.

As support for his position, defendant argues that this court should apply a recommendation made by the Sentencing Commission advising that mandatory minimum sentences for non-violent drug crimes be eliminated. See New Jersey Criminal Sentencing and Disposition Commission, Annual Report (Nov. 2019) (hereinafter "The Annual Report"), summary of recommendations.

In reviewing a sentencing determination by a trial court, the standard is highly deferential. See State v. Roth, 95 N.J. 334, 365 (1984) (determining appellate courts may not substitute their judgment for that of the sentencing court, unless the application of the sentencing guidelines to the facts makes the sentence "clearly unreasonable so as to shock the judicial conscience").

As our Supreme Court has made clear, "'when [trial judges] exercise discretion in accordance with the principles set forth in the Code [of Criminal Justice] and defined by [the Court] . . ., they need fear no second-guessing.'" State v. Bieniek, 200 N.J. 601, 607-08 (2010) (quoting State v. Ghertler, 114 N.J. 383, 384-85 (1989)). Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and -1(b), it "may impose a term within the permissible range for the offense." Id. at 608.

On October 19, 2020, the Legislature passed, and the Governor signed into law, three bills that codify recommendations five, seven and eight of The

Annual Report. L. 2020, c. 106; L. 2020, c. 109; L. 2020, c. 110. See also Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020), https://nj.gov/governor/news (hereinafter "The Governor's Press Release"). In turn, those recommendations were: recommendation five, "Create a New Mitigating Sentencing factor for youth"; recommendation seven "Create a Program, Called 'Compassionate Release,' that Replaces the Existing Medical Parole Statute for End-Of-Life Inmates"; and, recommendation eight "Reinvest Cost-Savings from Reductions in the Prison Population Arising from These Reforms into Recidivism Reduction and, to the Extent Available, Other Crime Prevention Programs." The Annual Report at 26, 30, 33. Notably, recommendation one, to "Eliminate Mandatory Minimum Sentences for Non-Violent Drug Crimes," was not among those adopted by the Legislature. Hence, the policy recommendation is of no legal consequence here.

At sentencing in this case, the trial court appropriately considered a number of factors, including defendant's prior offense record. That record included a carjacking in 1994, and a 2009 offense of possession with intent to distribute CDS within 500 feet of public property. It was also noted that over the past thirty years, defendant had served twelve years in prison. As well, it was noted that the State did not move for an extended term. Despite this, the

A-2872-18

State argued for the "higher range" of sentencing based on his prior history and the overwhelming evidence in this case.

In making his final determination, the sentencing judge noted that not only did defendant have multiple adult convictions, by the age of forty-four, but he also had twenty-four juvenile adjudications against him for various offenses and had been committed to multiple juvenile facilities, one of which he escaped from. In addition, the judge noted that aside from his now "sixth, seventh and eighth" indictable convictions, defendant had been arrested fifteen known times as an adult in New Jersey and Ohio and had previously violated parole.

Moreover, the trial judge noted that defendant had "five other pending cases before this court" "three of which allege CDS related crimes." In addition, in finding that no mitigating factors applied, the judge noted that the video evidence showed defendant was dealing drugs "right on top of small children, little boys and girls going to school with their backpacks on. Little pink coats walking right in front of you."

Given these circumstances, we readily conclude the trial court did not misapply its discretion or the governing law in imposing, after appropriate mergers, the maximum sentence for defendant's conviction.

All other points and sub-points raised on this appeal lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2872-18